Rosa Lee PHELPS; Lewis A. McAbee; Branda Switzer; Carolyn Poole; Mary Ann Gory; Joyce Wooford; Emma Young and Sandra New, individually and on behalf of all others similarly situated, Appellants,

v.

HOUSING AUTHORITY OF WOODRUFF and L.G. Casey, individually and in his official capacity as Director of the Housing Authority of Woodruff, and their officers, subordinates and successors, Appellees.

No. 83–1873.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 8, 1984.

Decided Aug. 24, 1984.

that Mr. Foster would take no part in representing Richards during the arbitration of its claims.

Harold F. Daniels, Piedmont Legal Services, Inc., Spartanburg, S.C., for appellants.

William E. Walsh, T.E. Walsh, Spartanburg, S.C., (Gaines & Walsh, Spartanburg, S.C., on brief), for appellees.

Before WIDENER, HALL and PHILLIPS, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

In this action brought under 42 U.S.C. § 1983, plaintiffs appeal from judgment entered for the defendants after a trial to the court. We affirm.

**1.** Defendants include the Housing Authority of Woodruff (Authority), the political body formed under S.C.Code § 31–3–310 (1976) that owns and operates Kelly Acres, and L.G. Casey, the Authority's Executive Director, who is responsible for day-to-day operation of the project.

**2.** The district court, on plaintiffs' motion, certified a class and three subclasses of "all persons who have applied for housing at Kelly Acres and are, or have been, eligible to reside there and;

## I

This suit challenges the legality of defendants' policies regarding admission of new tenants to Kelly Acres, a 100-unit public housing project located in Woodruff, South Carolina, and their methods of processing applications for tenancy at Kelly Acres.[1] The named plaintiffs represent a class of eligible applicants who allegedly have been aggrieved by these practices in a number of respects.[2]

Kelly Acres opened on March 1, 1976, as a result of efforts by the Housing Authority to fulfill its purpose of providing safe, decent and sanitary housing to low-income persons. Construction was originally financed from proceeds of bonds issued by the Authority, but since completion of construction, the debt service on these bonds has been paid by the United States Department of Housing and Urban Development (HUD). Although the principal source of funds for current operations is rent received from Kelly Acres' tenants, HUD also provides an annual operating subsidy, the amount of which depends primarily upon HUD's budget allocation from Congress.

As a precondition to receiving debt service funds, the Authority entered into an Annual Contributions Contract (ACC) with HUD, a 40-year contract that specifies the amounts to be paid by HUD and the duties of the Authority as manager/operator of Kelly Acres. The ACC, executed in 1975, requires the Authority to operate Kelly Acres not only in accord with provisions of the ACC, but in compliance with the United States Housing Act of 1937, as amended, and HUD regulations as well. HUD has performed periodic audits of Kelly Acres to

*Sub-class A*—who have not been promptly notified of their expected occupancy dates; *Sub-class B*—who have occupied substandard housing or have been involuntarily displaced, but have not been given a preference by defendants for occupancy of units; *Sub-class C*—whose occupancies have been delayed because of defendants' practice of maintaining vacant apartments within the project to await higher income apartments."

ensure the Authority's compliance with these conditions.

Applicants for tenancy at Kelly Acres are selected in accord with rules and regulations adopted by the Authority as approved by HUD. Each prospective tenant must submit a written application, the contents of which must be verified by the Executive Director. The application must be complete and verified before a unit may be offered, and all information regarding eligibility must be reverified if the application is more than 30 days old. The Authority discards applications that have been classified as inactive. The Authority does not notify applicants of the date they can expect to gain occupancy.

In considering which of its many applicants to admit, the Authority first considers the size of the vacant apartment vis-a-vis the size of the applicant's family. Kelly Acres's 100 units include 26 one-bedroom apartments, 30 two-bedroom apartments, 12 four-bedroom apartments, and 2 five-bedroom apartments. Historically, there has been little demand for the four- and five-bedroom apartments, but a shortage of two- and three-bedroom apartments.

Second, the Authority considers the applicant's rent paying ability.[3] In keeping with its statutorily-mandated goals of maintaining solvency[4] and achieving a broad tenant mix across a range of incomes, the Authority, with HUD approval, has adopted rent ranges and has allocated numbers of apartments to these ranges as follows:

### June 1979

| Rent Range | Units Allocated |
| --- | --- |
| $ 0–27 | 21 |
| 28–67 | 22 |
| 68–106 | 23 |

### June 1979

| Rent Range | Units Allocated |
| --- | --- |
| 107–146 | 21 |
| 147+ | 13 |

### March 1976

| Rent Range | Units Allocated |
| --- | --- |
| $ 0–30 | 10 |
| 31–40 | 10 |
| 41–50 | 14 |
| 51–60 | 22 |
| 61–70 | 22 |
| 71+ | 22 |

Finally, the Authority considers various preferences to which applicants might be entitled by virtue of some special status. Kelly Acres's 1976 HUD-approved policy handbook gives admissions to the following types of applicants, in order of importance:

1. Families displaced by governmental action or natural disaster.

2. Families of servicemen and families of veterans.

3. Families who are transferred due to work in the area.

4. Families in unsuitable living conditions (without housing or living in substandard housing).

The Handbook further sets priorities based upon three other criteria:

1. Families who live in Spartanburg County School District No. 4.

2. Families having an urgent need.

3. Date and time of application.

Thus, although the chronological order in which an application is submitted is afforded some importance, many other factors are considered more important.[5]

Since Kelly Acres opened its doors in 1976 it has consistently maintained a pool of applications far in excess of its available

---

3. The Housing Act and corresponding HUD regulations specify that only families whose incomes do not exceed 80% of the median income of the relevant local area are eligible for residence in Kelly Acres. A tenant's maximum monthly rental is proportional to his net family income. In August of 1982, this proportion was raised to 30% from its initial level of 25%.

4. The Authority adopts a yearly budget which is subject to HUD review and approval. One component of this budget is the Per Unit Monthly rental (PUM), the amount of rent that must be collected in order to keep Kelly Acres solvent.

5. These preferences and priorities appear to have been administered in at best an *ad hoc* fashion. The evidence at trial indicated that the Authority never required applicants to complete the portion of the application devoted to ascertaining whether the prospective tenant was entitled to a preference.

units. Nevertheless, it did not achieve 100% occupancy until December 8, 1982, some six years later. HUD audits over the years disclosed large numbers of units left vacant over considerable time periods. An audit conducted on July 13, 1982, indicated an average vacancy period of 123 days for the 11 units then vacant. Evidence at trial indicated that at least four apartments of varying size were vacant for periods of 1½ to 3¾ years, even though HUD had, in May 1977, waived rent range and unit size standards until Kelly Acres achieved 95% occupancy.

The named plaintiffs, all of whom were eligible for occupancy at Kelly Acres, submitted applications for rental of two- or three-bedroom apartments on varying dates. All of them were either denied admission or waited for long periods before being offered an apartment. This table reflects the eligibility dates of the named plaintiffs and their probable rent ranges: [6]

| Plaintiff | Dates Eligible | Probable Rent Range |
|---|---|---|
| Gory | Winter 1977 to July 1983 | $ 0–27 |
| Poole | August 17, 1978 until admitted on November 22, 1982 | 0–27 |
| Switzer | Summer 1979 to July 1983 | 0–27 |
| Phelps | Fall, 1979 to August 17, 1981 | |
| | October 1981 to July 1983 | 0–27 |
| Young | April 1978 to July 1983 | 28–67 |
| Wofford | March 2, 1982 to November 18, 1982 | 68–106 |
| New | January 1979 to March 1980 | |
| | January 13, 1981 to March 27, 1981 | 107–146 |
| | February 23, 1982 until admitted in July 1983 | |
| McAbee | August 19, 1981 to July 1983 | 107–146 |

Several of these plaintiffs, i.e., Gory, Young, and New, lived in substandard housing at the time they submitted their applications, making them eligible for preferential treatment. Yet other applicants, not entitled to preference, were admitted before they were.

Plaintiffs brought suit in November 1982 alleging that defendants had violated 42 U.S.C. § 1983 in several respects. First, plaintiffs in subclass B asserted that they were, in accordance with the terms of 42 U.S.C. § 1437d(c)(4)(A), entitled to preferential treatment in admissions to Kelly Acres because at the time of their applications they were living in substandard housing or were involuntarily displaced. Defendants, they alleged, had not afforded them this treatment, thereby denying them "rights secured by the ... laws" of the United States. Second, subclass A plaintiffs argued that defendants' failure to notify them of expected dates of occupancy deprived them of rights secured by 42 U.S.C. § 1437d(c)(3)(ii). Third, subclass B plaintiffs alleged that defendants had deprived them of a "property interest" in this preference without due process of law, in violation of the fourteenth amendment to the United States Constitution. Finally, subclass C tenants alleged that they had been denied equal protection of law by the defendants' practice of holding units vacant awaiting applications from tenants able to pay a higher rental rather than renting to currently available lower income applicants. Plaintiffs sought damages as well as declaratory and injunctive relief.

Trial was had to the court in July 1983, after which judgment was entered for de-

---

**6.** The exact dates of some applications were disputed at trial. Nevertheless, it is undisputed that plaintiffs Gory and New presented eligible applications in January 1979 and November 1978 respectively.

fendants. On authority of *Perry v. Housing Authority of Charleston,* 664 F.2d 1210 (4th Cir.1981), the court held that plaintiffs had proved no cognizable cause of action under § 1983. Alternatively, the court held that plaintiffs had not proved that any particular plaintiff had been denied a preference and as a result had been denied admission to Kelly Acres; and that, as a finding of fact, the Authority had not held apartments open to await higher income tenants. Finally, the court refused to award damages, holding that even if liability had been proven, the records did not furnish evidence sufficient to calculate a non-speculative award. This appeal followed.

## II

The plaintiffs first contend that the district court erred in holding that the defendants had not deprived them of "rights secured" by the Housing Act as amended, 42 U.S.C. § 1437. The plaintiffs dispute both the court's legal conclusion that the Housing Act's preference provisions did not give rise to rights actionable under 42 U.S.C. § 1983 and its finding that, in any event, plaintiffs had not been denied such rights. Because we agree with the district court's legal conclusion, we find it unnecessary to address the plaintiffs' factual contentions.

■■■ It is of course now established that 42 U.S.C. § 1983 may be invoked to redress certain violations of federal statutory law by state actors. *See Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Middlesex City Sewage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). It is equally clear, however, that not all violations of federal law are so actionable. Determining whether violation of a particular federal statute gives rise to § 1983 liability involves two inquiries. First, whether Congress, in enacting the statute, manifested in the statute itself an intent to foreclose its private enforcement? Second, whether the statute is of a kind aimed at creating enforceable "rights" under § 1983? *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Middlesex,* 453 U.S. at 17–20, 101 S.Ct. at 1539–41.

Plaintiffs argue that two such rights are implicit in the Housing Act and HUD regulations implementing it. First they contend that 42 U.S.C. § 1437d(c)(4)(A), and accompanying regulations, confers upon them a right to preferential admission to public housing projects, a preference which, they further argue, is enforceable under § 1983:

(c) Every contract for annual contributions shall provide that—

(4) the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project, including requirements pertaining to—

(A) [T]he establishment of tenant selection criteria which gives preference to families which occupy substandard housing or are involuntarily displaced at the time they are seeking assistance under this Act and which is designed to assure that, within a reasonable period of time, the project will include families with a broad range of incomes and will avoid concentrations of low-income and deprived families with serious social problems, but this shall not permit maintenance of vacancies to await higher income tenants where lower income tenants are available.

42 U.S.C. § 1437d(c)(4)(A).[7] Second, they argue that 42 U.S.C. § 1437d(c)(3)(ii) gives

7. HUD-adopted regulations implementing this section require:

(a) In addition to policies and regulations including preferences and priorities established by the PHA for eligibility and admission to its low-income housing projects pursuant to the Act and the ACC with respect thereto, each PHA shall adopt and implement policies and procedures embodying standards and criteria for tenant selection which take into consideration the needs of individual families for low-income housing and the statutory purpose in developing and operating socially and financially sound low-income housing

them a § 1983-enforceable right to receive notice of their expected date of occupancy:

> Every contract for annual contributions shall provide that—... (ii) any applicant determined to be eligible for admission to the project of the approximate date of occupancy insofar as such date can be reasonably determined.[8]

■ We disagree with plaintiffs' contentions for several reasons. First, although these sections of the statute clearly manifest Congressional intent to benefit generally applicants who are involuntarily displaced or who occupy substandard housing, its chosen means of accomplishing that end is plainly that HUD, rather than private litigants, is to be the enforcer of the statutory directive. Apart from the obvious lack of any affirmative statutory language indicating a Congressional intention to allow private remedial suits, the statute is replete with indications of an intention to entrust HUD with the means and the responsibility for effective enforcement. The statutory scheme requires the Secretary to include in all Annual Contributions Contracts a requirement that public housing authorities adopt tenant selection criteria which include express preferences and a requirement that eligible applicants be notified of expected occupancy dates "insofar as ... can be reasonably determined." Under the statute the Secretary performs extensive audits to verify the authorities' compliance with the conditions of the ACC,

and HUD is authorized, as contract promisee, to enforce compliance by the most drastic possible means: termination of the federal subsidies under the contract. In sum, the whole of the legislative scheme, we think, indicates Congress's intention that HUD should continue to enforce required conditions by means of asserting its rights under the ACC, thereby intending "to foreclose private enforcement" of the requirements of the Housing Act.[9]

Second, relevant to the second *Middlesex* inquiry, the "rights" allegedly conferred by the preference and notice statutes simply lack the quality necessary to be of a "kind enforceable under § 1983." Unlike the substantive rights sought to be redressed in *Thibotout*, i.e., federal AFDC benefits, in which the contours of the right claimed might be ascertained by courts with certainty, the "rights" asserted here are nebulous.

At the outside, 42 U.S.C. § 1437d(c)(4)(A) could only be read to grant the plaintiffs entitlement: (1) to have included in the ACC a requirement (2) that the defendants adopt selection criteria that (3) accommodates their preference (4) while also accommodating the equally important goals of achieving a tenant mix representative of a broad range of incomes *and* of achieving financial solvency. To find in this a judicially enforceable, federally secured individual "right" would require ascribing to

---

projects which provide a decent home and a suitable living environment and foster economic and social diversity in the tenant body as a whole.

(b) Such policies and procedures shall be designed to: (1) Avoid concentrations of the most economically and socially deprived families in any one or all of the PHA's low-income housing projects; (2) preclude admission of applicants whose habits and practices reasonably may be expected to have a detrimental effect on the tenants or the project environment; and (3) attain, within a reasonable period of time, a tenant body in each project composed of families with a broad range of incomes and rent-paying ability which is generally representative of the range of incomes of low-income families in the PHA's area of operation, as defined in State law.

24 C.F.R. § 860.204 (1983).

8. HUD regulations implementing this section likewise require:

§ 860.207 Notification to applicants.

.   .   .   .   .

(b) When a determination has been made that an applicant is eligible and satisfies all requirements for admission including the tenant selection criteria, the applicant shall be notified of the approximate date of occupancy insofar as that date can be reasonably determined.

24 C.F.R. § 860.207 (1983).

9. Although the plaintiffs do not assert a right of action as third-party beneficiaries of the ACC, we regard this argument foreclosed by *Perry v. Housing Authority,* 664 F.2d 1210, 1218 (4th Cir.1981).

Congress an assumption that courts of law could, and an intention that they should, make the necessary balancing of inevitably conflicting interests as between different applicants and possibly opposing statutory purposes that would be required to adjudicate individual claims of right. Given the difficulties—indeed the essential impossibility—of such a judicial task, we cannot ascribe such an assumption or intention to Congress.

■ Finally, this court has earlier considered, and rejected, an argument much like plaintiffs' in an action seeking relief for alleged violations of another section of the Housing Act. In *Perry v. Housing Authority*, 664 F.2d 1210 (4th Cir.1981), public housing tenants sought damages for the Authority's breach of its lease agreement, namely of covenants to repair. 42 U.S.C. § 1437d(c) mandated that every ACC require the landlord to comply with HUD procedures designed to protect tenant security. This court held that this requirement did not give plaintiffs individual rights enforceable under § 1983. Although it might be argued that *Perry* is distinguishable, since the preference and notice rights are more specific than · § 1437d(c)'s general requirement of maintaining tenant security, we are not persuaded that this distinction is of sufficient moment to alter our conclusion that the

defendants' actions did not deprive the plaintiffs of any "rights secured by the . . . laws of the United States." [10]

## III

Plaintiffs next argue that defendants' acts of denying their "preference" deprived them of "property . . . without due process of law" in violation of the fourteenth amendment. We disagree.

■ The initial inquiry is whether plaintiffs have been deprived of a "property" interest, *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), to which they have a "legitimate claim of entitlement." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Such a property interest must arise from "an independent source, such as state law." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

■ Plaintiffs assert such an "independent source" in the preference language of 42 U.S.C. § 1437d(c)(4)(A). Although the argument that public housing applicants have limited due process rights in the determination of their applications has some support in the case law, the parties cite no case directly holding that the preference requirement arises to the level of a constitutionally-protected property interest, and our research does not disclose any.[11] We

---

**10.** Appellants argue that the district court erred in holding that 42 U.S.C. § 1437d(c)(4)(A) and 42 U.S.C. § 1437d(c)(3)(ii) do not give rise to implied private causes of action. It is somewhat unclear whether they make this argument only in response to the district court's holding that in order for a violation of a federal statute to be actionable under § 1983, that statute must be of such a quality that in essence it gives rise to such an implied action, or whether they suggest that they had asserted such a separate private right of action that was erroneously denied.

As both the complaint and the court's opinion are cast in § 1983 terms, we consider the former interpretation more plausible. The inquiry under either interpretation of the appellant's position is similar, though not perfectly congruent. Nevertheless, lest our disposition of the case seem incomplete, we reject plaintiffs' implied private cause of action argument on the reasoning of *Perry v. Housing Authority*, 664 F.2d 1210 (4th Cir.1981).

**11.** Plaintiffs buttress their argument, however, with two analogous cases. In *Ressler v. Pierce*, 692 F.2d 1212 (9th Cir.1982), for example, the court held that a public housing tenant who, by virtue of her status as a tenant, might be eligible for federal rent subsidies under section 8 of the Housing and Community Development Act of 1974, 42 U.S.C. § 1437f, had a property interest in such benefits sufficient to mandate orderly processing of her benefits application. Likewise, in *Holmes v. New York City Housing Authority*, 398 F.2d 262 (2d Cir.1968), the court held that due process required orderly procedures and ascertainable standards for selecting among applicants for public housing.

We do not necessarily disagree with *Ressler*. The claim to section 8 subsidies of one who is *already* a tenant in a qualifying public housing project seems to us much more ascertainable and "property-like" in character than the plaintiffs' interest in any "preference" here. To the extent that *Holmes* is inconsistent with our deci-

are of the opinion that no such property interest exists. Given the almost infinite amalgam of factors that must guide the Authority's discretionary tenant selections, we believe that the "preference" to which any particular applicant might lay claim is so contingent upon the relative merits of all other applications and so subject to the exercise of legitimate management discretion that any particular plaintiff's prospect of being admitted must be considered merely an expectation, rather than an entitlement rising to the level of constitutionally protected property interests.

## IV

Finally, plaintiffs argue that defendants' alleged practice of holding apartments vacant awaiting higher-income applicants despite the availability of substantial numbers of lower-income applicants constitutes a violation of the fourteenth amendment's equal protection clause redressable under 42 U.S.C. § 1983. We disagree.

Assuming, arguendo, that the district court's factual findings on this issue, i.e., that the Authority had not maintained vacancies in an effort to secure higher-rent tenants, are clearly erroneous, a holding we would hesitate to make on the record before us, we believe that such a practice is, in the particular circumstances of this case, rationally related to two legitimate governmental objectives. First, collection of a higher monthly rental would obviously help maintain the project's solvency, which appears to have been in constant jeopardy. Second, renting vacant apartments to higher income tenants would contribute to the realization of a goal mandated by 42 U.S.C. § 1437d(c)(4)(A) itself, that of achieving a mix of tenants across a broad range of incomes. For this reason, we reject the appellants' equal protection argument as well.[12]

## V

For the reasons stated above, the judgment of the district court is affirmed.

AFFIRMED.

---

sion in this case, however, we respectfully disagree with it.

**12.** We also regard as questionable the assertion that the Authority's acts established a wealth-based classification subject to equal protection scrutiny. *All* eligible applicants, whether or not ultimately admitted to Kelly Acres, had incomes below 80% of the median for the relevant area.