799 F.2d 385
 Agnes HILL, Cherie A. Hill, Beverly Hill, Henrietta Johnson,
Salina Johnson, Helen Jones and Eva Belle,
individually and on behalf of all others
similarly situated, Appellants,
v.
GROUP THREE HOUSING DEVELOPMENT CORPORATION, a Missouri
Corporation; Joseph A. Shephard, Richard C. Mange, 1st
Murphy-Blair Redevelopment Corporation, a Missouri
Corporation, Consolidated Neighborhood Services, Inc., a
Missouri non- profit Corporation, Missouri Housing
Development Commission, Wayne L. Milsap, in his official
capacity as Chairman of the Missouri Housing Development
Commission, Samuel R. Pierce, Jr., in his official capacity
as Secretary of the United States Department of Housing and
Urban Development, Gerald Simpson, in his official capacity
as Kansas City Regional Director, Region VII of the United
States Department of Housing and Urban Development, Appellees.
 No. 85-2303.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 12, 1986.
Decided Aug. 21, 1986.
 
 Mark J. Cardosi, St. Louis, Mo., for appellants.
 Mark W. Pennak, Washington, D.C., for appellees.
 Before ROSS, McMILLIAN, and BOWMAN, Circuit Judges.
 BOWMAN, Circuit Judge.
 
 
 1
 Plaintiffs appeal from the District Court's[1] order dismissing their complaint without prejudice. The plaintiffs are seven low-income women who applied under the Section 8 housing assistance payments program, 42 U.S.C. Sec. 1437f (1982), for admission to two privately owned apartment complexes in the St. Louis metropolitan area. Plaintiffs allege that the denial of their applications violated their federal constitutional rights to procedural due process and equal protection, their rights under Section 8 and the Administrative Procedure Act, 5 U.S.C. Secs. 702 & 706, and their contractual rights as third party beneficiaries. For the reasons discussed below, we affirm the judgment of the District Court.
 
 I.
 
 2
 Plaintiffs applied for admission to the Hidden Valley Estates Apartments and the Murphy-Blair Townhouses, both of which are privately owned apartment complexes that participate in the Section 8 low-income housing assistance program. Between September 1983 and May 1984 each of the plaintiffs' applications was denied by the private owners.[2] Allegedly, though the District Court made no findings on this issue, each of the plaintiffs satisfied the family and income eligibility requirements of the Section 8 program. Some of the plaintiffs requested and were granted an informal interview with the private owner to discuss the reasons for their denials.
 
 
 3
 Plaintiffs brought suit seeking injunctive and declaratory relief against the private owners and operators of the apartment complexes and various state and federal housing agency officials. In particular, plaintiffs alleged that (1) defendants' failure to provide applicants with uniform, ascertainable admissions standards, adequate and specific written reasons for rejection of their applications for admission, and a prompt and meaningful opportunity for a hearing violated their rights to procedural due process; (2) the failure to accord Section 8 applicants the same procedural protections accorded applicants for conventional public housing under 42 U.S.C. Sec. 1437 et seq. has no rational basis, and thus violates plaintiffs' rights to equal protection of the law; (3) defendants' rejection of plaintiffs' applications for admission violated their rights under Section 8, 42 U.S.C. Sec. 1437f (1982); (4) defendants' rejection of plaintiffs' applications violated their rights as third party beneficiaries of the housing assistance payments contracts between the private owners and the federal and state housing agencies; and (5) the federal defendants' failure to take affirmative action to enforce the obligations of the private owners under Section 8 fairly and rationally to administer the Section 8 program in accordance with federal constitutional and statutory standards is arbitrary, capricious, and an abuse of discretion in violation of the federal Administrative Procedure Act, 5 U.S.C. Secs. 702 & 706.
 
 
 4
 The District Court, upon motion by defendants, dismissed plaintiffs' complaint without prejudice. Hill v. Group Three Housing Development Corp., 620 F.Supp. 355 (E.D.Mo.1985). The court reviewed the statutory scheme, the regulations, and the administrative guidelines developed by the Department of Housing and Urban Development (HUD), and held that they did not create a legitimate claim of entitlement to housing or benefits for Section 8 applicants. Id. at 357. Thus, plaintiffs had no "property" right entitled to due process protection. The court dismissed plaintiffs' other federal statutory claims and the breach of contract claim also on the ground that plaintiffs had no legitimate claim of entitlement under the Section 8 program. Id. at 358. Finally, the court dismissed the equal protection claim on the ground that applicants for Section 8 housing and applicants for conventional public housing are not similarly situated; thus, different treatment of the two classes does not violate equal protection. The court alternatively held that the difference in treatment was rationally related to a legitimate governmental purpose. Id. Plaintiffs appeal from the dismissal of each of their claims.
 
 II.
 
 5
 Section 8 was enacted as part of the Housing and Community Development Act of 1974, Pub.L. No. 93-383, 88 Stat. 633 (codified as amended at 42 U.S.C. Sec. 1437f). The stated purpose of the Section 8 program is to aid lower-income families in obtaining a decent place to live and to promote economically mixed housing. 42 U.S.C. Sec. 1437f(a); see 24 C.F.R. Sec. 883.101(a) (1984). To that end, the Secretary of HUD is authorized to enter into contracts to make housing assistance payments to private owners of housing in which some or all of the units shall be leased to lower-income families. 42 U.S.C. Sec. 1437f(b)(1) & (2) (1982).[3] The Secretary also is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may contract to make assistance payments to private owners. Id. Under these contracts, the amount of the monthly assistance payment is the difference between the maximum monthly rent provided in the contract between the private owner and the Secretary and the amount the tenant is required to pay as rent. Id. Sec. 1437f(c)(3).
 
 
 6
 The statutory scheme clearly indicates that Congress desired to place responsibility for the operation and management of the Section 8 program, including the selection of tenants, with the private owner. Where the Secretary has contracted directly with the private owner, the statute directs that the contract "shall provide that all ownership, management, and maintenance responsibilities, including the selection of tenants ... shall be assumed by the owner...." Id. Sec. 1437f(e)(2). Similarly, the statute mandates that contracts between a state public housing agency and a private owner "shall provide ... that the selection of tenants for such unit shall be the function of the owner...." Id. Sec. 1437f(d)(1)(A). The statutory language clearly evidences a congressional itnent to encourage the participation of the private sector in providing low-income housing by leaving management decisions (which includes the selection of tenants) to the private owner.
 
 
 7
 Further evidence of this congressional intent is found in the legislative history to the 1979 amendments to Section 8. The amendments to subsections (d)(1)(A) and (e)(2) reaffirmed the private owner's exclusive responsibility for tenant selection, but provided that "tenant selection criteria used by the owner shall give preference to families which occupy substandard housing or are involuntarily displaced at the time they are seeking assistance...." Housing and Community Development Amendments of 1979, Pub.L. No. 96-153, Sec. 206(b)(1) & (2), 93 Stat. 1101, 1108 (amending 42 U.S.C. Sec. 1437f). The House Report explains, however, that this preference
 
 
 8
 is not intended nor should it be used to allow the Department to direct an owner ... to select certain tenants. It would be unacceptable and clearly not authorized by this provision for the Department to require a[n] ... owner to select tenants from a list developed by the Department. This provision is not intended to alter the basic responsibility over tenant selection which, under current law, rests solely with the ... owner.
 
 
 9
 H.R.Rep. No. 154, 96th Cong., 1st Sess. 16 (1979), reprinted in 1979 U.S. Code Cong. & Ad. News 2317, 2332.
 
 
 10
 The regulations promulgated by HUD for the various Section 8 subprograms[4] also recognize the private owner's discretion in the selection of tenants. See 24 C.F.R. Secs. 880.103(d) (stating that "the owner is responsible for all management functions, including ... selection of tenants...."), 883.103(d), 883.702(b), 886.119(a)(3) (1984). The private owner is responsible for determining whether an applicant satisfies HUD's income and family eligibility criteria, see 24 C.F.R. Parts 812 & 889 (1984), and for the selection of families as tenants. See 24 C.F.R. Secs. 880.603(b), 883.101(f), 883.704(b), 886.119(a)(3) (1984). The language used in the regulations clearly makes a distinction between "eligibility" and "selection." Although an applicant may be "eligible" in the sense of meeting the threshold statutory income and family criteria, the applicant also must be "otherwise acceptable" to the private owner in order to be selected. See id. Secs. 880.603(b)(2) & (3), 883.704(b)(2) & (3) (1984).
 
 
 11
 HUD also distributes to private owners a handbook, entitled HUD Transmittal Handbook No. 4350.3 ("HUD Handbook" or "Handbook"), which HUD describes as a "one-source rule book," explaining the administrative policies and procedures governing the Section 8 program. The Handbook suggests that owners should develop a written tenant-selection plan setting forth the reasons for which applicants may be rejected. HUD Handbook p 2-15(c). The Handbook lists permitted screening criteria and states that owners should consider at least the four factors listed, but that they may establish other criteria not otherwise prohibited. Among the permitted screening criteria are (1) demonstrated ability to pay rent on time; (2) comments from former landlords; (3) poor credit references; and (4) housekeeping habits. Id. p 2-16. An owner must comply with all federal, state, and local fair housing and civil rights laws and with all Equal Opportunity requirements. Id. p 2-18.[5] An owner also is required to comply with various preference rules established by statute, regulation, or otherwise adopted by the owner. Id. p 2-19.
 
 
 12
 Subject to those limitations, the Handbook states that an owner may reject an applicant if the "applicant does not meet the owner's tenant selection criteria." Id. p 2-21(a)(4). If an applicant is rejected, the owner is required promptly to notify the applicant in writing of the rejection, explain the reasons for the rejection, and advise the applicant that he or she has 14 days to respond in writing or to request an informal meeting to discuss the rejection with a member of the owner's staff. Id. p 2-21(b)-(d); see also 24 C.F.R. Sec. 883.704(b)(3) (1984). There is no formal review procedure by HUD or any other federal or state agency of a private owner's rejection of an applicant.[6]
 
 III.
 A.
 
 13
 Plaintiffs first contend that applicants acquire a "property" right in the receipt of Section 8 housing benefits at the time they establish their income and family eligibility. Plaintiffs' due process argument is premised on a combination of two different propositions. First, plaintiffs assert that the Section 8 housing program was intended to benefit low-income families. Plaintiffs further assert that they meet the statutory income and family eligibility requirements of the Section 8 program, and therefore are within the class of persons for whom the Section 8 program was intended to benefit. Thus, their argument goes, because they are members of the class of intended beneficiaries of the Section 8 program, their likelihood of receiving Section 8 benefits is substantial enough to merit due process protection. Second, plaintiffs contend that although income and family eligibility alone does not guarantee receipt of Section 8 benefits, the statute, the regulations, and the HUD Handbook use such mandatory language and impose such significant, substantive limitations on a private owner's discretion in the tenant-selection process that an eligible applicant's likelihood of receiving Section 8 benefits is sufficient to create a property interest entitled to due process protection.
 
 
 14
 Under the current two-prong procedural due process analysis, plaintiffs first must establish that they have a protected "property" interest in the benefits sought. The Supreme Court articulated the proper standard to determine the existence of a property interest in the seminal case of Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972): "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Thus, plaintiffs must establish that applicants have a "legitimate claim of entitlement" to Section 8 benefits merely upon a showing that they satisfy the statutory income and family eligibility requirements.[7]
 
 
 15
 Plaintiffs rely primarily on two cases to support their position. In Ressler v. Pierce, 692 F.2d 1212, 1214-16 (9th Cir.1982), the Ninth Circuit held that applicants have a constitutionally protected property interest in Section 8 benefits entitling them to procedural safeguards in the application and tenant-selection process. The Ninth Circuit based its holding on two factors. First, the court stated that private owners "ha[ve] only limited discretion in the Section 8 application and selection process." Id. at 1215. The court distinguished one of its prior cases finding no property interest on the ground that in that case the entity charged with dispensing the governmental benefits had "unbridled discretion" in the selection process. Id. (distinguishing City of Santa Clara v. Andrus, 572 F.2d 660 (9th Cir.1978)). In contrast, although apparently conceding that the statute itself imposed no limitations, the Ressler court stated that the regulations and HUD Handbook guidelines "closely circumscribe an owner's discretion" in the Section 8 tenant-selection process. 692 F.2d at 1215. Second, the Ressler court found a property interest in Section 8 benefits "by virtue of [an applicant's] membership in a class of individuals whom the Section 8 program was intended to benefit." Id.
 
 
 16
 The second case on which plaintiffs rely is Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). In Greenholtz the Supreme Court held that a Nebraska parole statute provided a sufficient expectancy of release to create a "liberty" interest entitled to some constitutional protection. Id. 442 U.S. at 12, 99 S.Ct. at 2106. The statute provided that the Board of Parole "shall" release an eligible inmate "unless" one of four statutory factors was applicable. The statute also listed fourteen factors (including one "catch-all" factor allowing consideration of any other relevant matter) that the Board was required to consider in making its parole release decision. The Court, however, was quick to emphasize the "unique structure and language" of the Nebraska parole statute, and noted that other statutes should be considered on a case-by-case basis. Id. The Court also noted that the mere possibility of parole did not create a protected interest. Id. at 11, 99 S.Ct. at 2105.
 
 
 17
 Plaintiffs argue that the Section 8 regulations and HUD Handbook contain similar structure and mandatory language in their tenant-selection provisions. Specifically, plaintiffs cite to regulations providing that
 
 
 18
 [i]f the owner determines that the family is eligible and is otherwise acceptable and units are available, the owner will assign the family a unit.... If no suitable unit is available, the owner will place the family on a waiting list for the project and notify the family of when a suitable unit may become available.
 
 
 19
 24 C.F.R. Secs. 880.603(b)(2), 883.704(b)(2); see also HUD Handbook p 2-20. In addition, plaintiffs cite to the Handbook provisions regarding applicant preferences, selection criteria, and restrictions on private owners in the tenant-selection process, see supra Part II, at 389-90, to support their contention that an owner's discretion is sufficiently limited to establish an applicant's legitimate claim of entitlement to Section 8 benefits.
 
 
 20
 We reject plaintiffs' contention that Section 8 applicants possess a property right simply by virtue of their membership in the class (low-income families) that Section 8 was intended to benefit. As noted above, this factor was relied upon by the Ninth Circuit in Ressler. Although this factor is a starting point for due process analysis, in our view it is far from dispositive of the question whether an individual applicant has a legitimate claim of entitlement to Section 8 benefits. No individual applicant, though perhaps eligible for Section 8 benefits, is necessarily entitled to such benefits. The private owner retains broad discretion to select a tenant from among the eligible applicants, and is free within wide limits to turn away eligible applicants. Thus, we cannot agree that proof of membership in the class to be benefitted satisfies the plaintiffs' burden of establishing a legitimate claim of entitlement to Section 8 housing.
 
 
 21
 Nor do we agree with plaintiffs' contention that the Section 8 regulations and HUD Handbook use such mandatory language and impose such significant, substantive limitations on a private owner's discretion in the tenant-selection process that applicants acquire a property interest at the time they establish income and family eligibility. In rejecting plaintiffs' argument, we expressly note our agreement with the reasoning of the Seventh Circuit in Eidson v. Pierce, 745 F.2d 453 (7th Cir.1984). The Seventh Circuit noted that the Section 8 statute, regulations, and HUD Handbook guidelines "circumscribe to some extent the owner's discretion in selecting tenants." Id. at 459. But that fact alone was not sufficient to create a property interest in view of the broad discretion vested in the owner in the tenant-selection process.
 
 
 22
 The selection of tenants is obviously not left to the owner's unfettered discretion. Section 8 requires the owner to apply the eligibility criteria based on income and family size. In addition, preference must be given to certain subclasses of eligible applicants.... Nevertheless, Section 8 contemplates a selection process involving other, less tangible factors in addition to statutory eligibility. The owner may determine that a family is eligible and "otherwise acceptable," or the owner may reject an application based on statutory criteria or for "other reasons." The HUD Handbook makes it clear that the program contemplates private owners determining whether eligible applicants are likely to be responsible tenants.
 
 
 23
 Id.
 
 
 24
 The Eidson court expressly rejected the Ninth Circuit's analysis in Ressler on this point.
 
 
 25
 The cited limitations [relied upon by the Ressler court] affect the allocation of Section 8 benefits among certain subclasses of eligible persons.... These criteria which benefit certain subclasses of eligible [applicants] do not, however, affect an owner's choice between two similar, eligible individual applicants. The law does not tell the owner how to decide who is more likely to be a responsible tenant, and the law does not question the owner's decision so long as it does not involve invidious discrimination. Although ... the statute and HUD's administrative guidelines provide some standards of eligibility, reliance on these alone does not take into account an owner's discretion and therefore can hardly furnish an adequate framework for due process hearings to distinguish "worthy" from "unworthy" applicants.
 
 
 26
 We believe--without appraising the merits of its decision--that Congress intended that a rent subsidy be paid on behalf of only those tenants whom an owner has selected. But broad discretion was left in the owner to make the selection.
 
 
 27
 Id. at 463.
 
 
 28
 Like the Eidson court, we do not believe that the procedures and limitations imposed by the Section 8 regulations and the HUD guidelines on an owner's discretion in the tenant-selection process rise to the level required to establish a property interest.[8] The Section 8 statute, regulations, and HUD guidelines do not use "language of an unmistakably mandatory character," Hewitt v. Helms, 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983), similar in substance or form to those statutes found sufficient to create a protected interest. Nor do they contain "particularized substantive standards or criteria which significantly guide" an owner's discretion in tenant selection. Parker v. Corrothers, 750 F.2d 653, 656 (8th Cir.1984). The substantive limitations on an owner's discretion are minimal. There remains much room for an owner's exercise of discretion and business judgment. See Phelps v. Housing Authority, 742 F.2d 816, 822-23 (4th Cir.1984); cf. Olim v. Wakinekona, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 467, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981) (Brennan, J., concurring). As the Eidson court noted, "Section 8 entitlements depend on discretionary judgments which, in some respects, are not constrained by any legal criteria." 745 F.2d at 462. Finally, the fact that certain procedures are mandated for the processing of Section 8 applications does not establish a constitutionally protected property right. See Olim, 461 U.S. at 250, 103 S.Ct. at 1748 ("Process is not an end in itself."); Hewitt, 459 U.S. at 471, 103 S.Ct. at 871 (stating that "the creation of procedural guidelines to channel the decision-making" of state officials does not alone create a property or liberty interest); Hogue v. Clinton, 791 F.2d 1318, 1324 (8th Cir.1986) (suggesting that the procedures mandated must place "significant substantive restrictions on the decision-making"); Lyon v. Farrier, 727 F.2d 766, 768 (8th Cir.) (stating that "procedural protections alone, absent an underlying substantive entitlement, do not constitute substantive, protected interests"), cert. denied, 469 U.S. 839, 105 S.Ct. 140, 83 L.Ed.2d 79 (1984); Vruno v. Schwarzwalder, 600 F.2d 124, 130 (8th Cir.1979) (holding that although statute provided for procedures and guidelines for state and local officials to follow, it did not establish property right or claim of entitlement to public employment).
 
 
 29
 The Eidson court found other fatal deficiencies in the plaintiff-applicants' due process theory.
 
 
 30
 The plaintiffs' central difficulty may be framed by asking, as a practical matter, what would be at issue in the hearings plaintiffs seek.
 
 
 31
 The plaintiffs' applications were rejected on the basis of unfavorable information from prior landlords and credit checks. At first blush, such information appears to be similar to that involved in the termination of plaintiffs' welfare payments in Goldberg v. Kelly [, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 28]. The information may well be of questionable reliability, and the plaintiffs here might, at hearings, be able to refute the damaging information which was ostensibly the basis for the rejections. But even if the plaintiffs proved that the information was false, they would still not be entitled to Section 8 housing. They are entitled to housing, as opposed to eligible for it, only after a private owner accepts their applications. The owner's decision is subject to some statutory, regulatory and contractual limits, but those limits apply only to classes of potential tenants. The law does not tell the owner how to choose between two eligible individuals. The owner remains free to accept applications only from those persons he or she expects to be responsible tenants, and the Section 8 program does not constrain the owner's judgment on that question.
 
 
 32
 ....
 
 
 33
 That is the controlling difference between these cases and Goldberg v. Kelly, for a mandatory hearing would do little either to benefit the applicant or to promote the public interest. In Goldberg and numerous other public benefit cases, the law established eligibility criteria, and any person who satisfied those factual criteria was entitled to the benefits. A hearing would thus be an effective remedy for the individual because it would provide a reliable means for resolving disputed facts entitling the person to benefits. Section 8 is not, however, a simple entitlement program. The eligible [applicant] must be accepted by a private landlord in order to receive benefits. Factual findings at a hearing could therefore not entitle these plaintiffs to Section 8 benefits.
 
 
 34
 745 F.2d at 460-61.
 
 
 35
 We agree with this reasoning.[9] Even if Section 8 applicants rejected by an owner were to receive a hearing, there still is nothing that legally would require the owner to accept the applicant. To borrow from the language in Greenholtz, the tenant-selection process is
 
 
 36
 subtle and depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the [private owners] based upon their experience with the difficult and sensitive task of evaluating the [responsibility of tenant applicants].... [T]here is no set of facts which, if shown, mandate a decision favorable to the individual.
 
 
 37
 442 U.S. at 9-10, 99 S.Ct. at 2104-05. In short, while the selection of tenants is not left to the private owner's unfettered discretion, absent invidious discrimination the actual selection of individual tenants from among the class of otherwise eligible applicants is left exclusively to the owner's business judgment and discretion.
 
 
 38
 For the reasons stated above, we hold that applicants do not acquire a "legitimate claim of entitlement" to or a "property" interest in the receipt of Section 8 benefits merely upon proof that they satisfy the statutory income and family eligibility requirements. We therefore affirm the District Court's dismissal of plaintiffs' procedural due process claim in count I of the complaint.
 
 B.
 
 39
 Plaintiffs next contend that the failure to accord Section 8 applicants the same procedural safeguards accorded applicants for conventional public housing under 42 U.S.C. Sec. 1437 et seq. is not rationally related to any legitimate governmental objective, and thus violates plaintiffs' rights to equal protection of the laws.
 
 
 40
 We agree with the District Court that equal protection analysis is not applicable here since the two groups of applicants are not similarly situated. The two classifications result from two separate statutes representing two different approaches to the provision of housing for low-income persons. Each statute on its face admits of only one class--low-income families. What plaintiffs in essence are complaining about is a policy choice made by the same body politic within whose jurisdiction this dispute properly and exclusively belongs--Congress. We therefore affirm the District Court's dismissal of plaintiffs' equal protection claim in count II of the complaint.
 
 C.
 
 41
 Plaintiffs next contend that defendants' refusal to rent apartments to them, notwithstanding the fact that they met all the statutory eligibility criteria, violated their rights under Section 8. We note that plaintiffs failed to specify in their complaint exactly what "rights" under Section 8 defendants allegedly violated by rejecting their applications. In any event, we do not believe that Congress intended to permit an implied private right of action under Section 8 by rejected applicants.
 
 
 42
 In determining whether there is an implied private right of action under a federal statute not expressly providing for one, the Supreme Court has developed a four-factor test. The plaintiff must show that (1) he is a member of the class for whose especial benefit the statute was enacted and that the statute creates a federal right in his favor; (2) there is some indication of legislative intent to create such a remedy; (3) it is consistent with the underlying purposes of the legislative scheme to imply such a remedy; and that (4) the cause of action is not one traditionally relegated to state law such that it would be inappropriate to infer a cause of action based solely on federal law. Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975).[10] The focus is on congressional intent.
 
 
 43
 After reviewing the statute, the regulations, and the HUD Handbook guidelines governing the Section 8 program, we are of the opinion that Congress did not intend to create enforceable rights for individual applicants nor to allow private enforcement of the Section 8 program. Thus, we hold that plaintiffs have no implied private right of action under Section 8.
 
 
 44
 First, we agree with the Fourth Circuit's reasoning in a similar case that, although the Section 8 statute and regulations clearly manifest congressional intent to benefit low-income families generally,
 
 
 45
 its chosen means of accomplishing that end is plainly that HUD, rather than private litigants, is to be the enforcer of the statutory directive. Apart from the obvious lack of any affirmative statutory language indicating a Congressional intention to allow private remedial suits, the statute is replete with indications of an intention to entrust HUD with the means and the responsibility for effective enforcement.... In sum, the whole of the legislative scheme ... indicates Congress's intention that HUD should continue to enforce required conditions by means of asserting its rights under the [housing assistance payments contracts], thereby intending "to foreclose private enforcement" of the requirements of the Housing Act.
 
 
 46
 Phelps v. Housing Authority, 742 F.2d 816, 821 (4th Cir.1984). As the Fourth Circuit noted, HUD is involved in some way in nearly every aspect of the Section 8 program, and possesses power commensurate with its responsibility for effective enforcement of the program. See, e.g., 24 C.F.R. Secs. 880.504, 880.505, 880.603, 883.605, 883.713(b), 886.129, 886.130 (1984) (specifying HUD's power to enforce sanctions for noncompliance with Section 8 contracts, its powers of review, and its responsibilities for the administration of Section 8 contracts).
 
 
 47
 Second, our holding in Part III.A., supra, that Section 8 applicants possess no property right to housing benefits necessarily disposes of plaintiffs' claim to rights under the statute itself. If applicants had any legitimate claim of entitlement to housing under the statute, they ipso facto would have a protected property right for purposes of due process analysis. We agree with the Eidson court that "there is nothing to suggest that Congress intended potential tenants [applicants] of Section 8 projects to have enforceable rights to Section 8 housing in particular projects." 745 F.2d at 462.
 
 
 48
 Holding that plaintiffs have neither an enforceable right to Section 8 housing nor an implied private right of action under the statute, we affirm the District Court's dismissal of plaintiffs' claim under Section 8 in count III of the complaint.
 
 D.
 
 49
 Plaintiffs' next claim is that the private owners' rejection of their applications for admission, notwithstanding the fact that plaintiffs met the statutory income and family eligibility criteria, violated plaintiffs' rights as third party intended beneficiaries of the housing assistance payments contracts between the private owners and the federal and state housing agencies.
 
 
 50
 We find this claim to be without merit. As discussed above, individual applicants have no right of admission to any particular Section 8 housing project, regardless of the fact that they may satisfy the threshold eligibility criteria. In all cases, the individual applicant still must be "otherwise acceptable" to the private owner. Plaintiffs have not referred us to any provision in the contract or elsewhere that is to the contrary.[11] Thus, even assuming arguendo that plaintiffs as Section 8 applicants could be considered intended third party beneficiaries of the housing contract, an issue we do not decide, compare Holbrook v. Pitt, 643 F.2d 1261, 1271-73 (7th Cir.1981) (holding that existing tenants--not applicants--had enforceable rights under contracts as intended third party beneficiaries) with Perry v. Housing Authority, 664 F.2d 1210, 1218 (4th Cir.1981) (holding that existing tenants were not intended third party beneficiaries), the right plaintiffs seek to have judicially recognized and enforced simply does not exist. We therefore affirm the District Court's dismissal of plaintiffs' breach of contract claim in count IV of the complaint.
 
 E.
 
 51
 Plaintiffs' final contention is that defendant federal and state housing officials have failed to enforce the obligations of the private owners fairly and rationally to administer the Section 8 program in accordance with federal statutory and constitutional standards. This failure, plaintiffs contend, was arbitrary, capricious, and an abuse of discretion and has resulted in plaintiffs' federal statutory and constitutional rights being violated, thus entitling plaintiffs to relief under the federal Administrative Procedure Act (APA), 5 U.S.C. Secs. 702 & 706.
 
 
 52
 The APA's comprehensive provisions for judicial review of "agency actions" are contained in 5 U.S.C. Secs. 701-706. Any person "adversely affected or aggrieved" by final agency action, including a failure to act, is entitled to judicial review thereof. 5 U.S.C. Sec. 702. Defendants, however, maintain that, even assuming there has been a violation of plaintiffs' rights, which they deny, HUD's decision not to take enforcement action in this case against the private owners is a decision committed to the agency's absolute discretion, and thus is not subject to judicial review under the APA. See 5 U.S.C. Sec. 701(a)(2).
 
 
 53
 Section 701(a)(2) of the APA precludes judicial review of any action or decision by an administrative agency to the extent that "agency action is committed to agency discretion by law." The Supreme Court has stated, however, that Sec. 701(a)(2) "is a very narrow exception" that only applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)). In other words, judicial review is precluded only when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).
 
 
 54
 However, in cases involving an agency's decision not to take enforcement action, the Court in Chaney created a "presumption of unreviewability." Id. 105 S.Ct. at 1657; see also id. at 1656 (stating that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion" and "should be presumed immune from judicial review under Sec. 701(a)(2)"). The Court explained that
 
 
 55
 the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers. Thus, in establishing this presumption in the APA, Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers. Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue....
 
 
 56
 ....
 
 
 57
 ... If [Congress] has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is "law to apply" under Sec. 701(a)(2), and courts may require that the agency follow that law; if it has not, then an agency refusal to institute proceedings is a decision "committed to agency discretion by law" within the meaning of that section.
 
 
 58
 Id. at 1656-58. Thus, the question presented is whether Congress has provided "meaningful standards for defining the limits" of HUD's enforcement discretion under Section 8 such that there is "law to apply" under Sec. 701(a)(2) for purposes of judicial review.
 
 
 59
 We note that plaintiffs again have failed to specify exactly what "obligations of the [private] owners" under Section 8 HUD allegedly has refused to enforce. Significantly, plaintiffs have not alleged any form of discrimination expressly prohibited by the Section 8 statute, regulations, or HUD Handbook guidelines. See, e.g., 24 C.F.R. Sec. 883.704(b)(1) (1984) (limiting the use of local residency requirements); 24 C.F.R. Secs. 880.210, 880.601, 883.312, 883.702, 886.114, 886.119 (1984) (requiring compliance with federal fair housing and equal opportunity laws and other federal statutes); HUD Handbook p 2-18 (same). Moreover, we already have found plaintiffs' allegations of federal constitutional and statutory violations to be without merit. Thus, plaintiffs' claim boils down to an argument that HUD and state housing officials were required under Section 8 to ensure that the private owners gave full and fair consideration to their applications in the tenant-selection process and complied with all provisions of the statute, regulations, and HUD's administrative rules.
 
 
 60
 The fatal flaw in plaintiffs' claim is that it again assumes a nonexistent right and fails to take into account the fact that a private owner has broad discretion in the tenant-selection process of the Section 8 program. Absent an allegation of unlawful discrimination or a "colorable claim ... that the agency's refusal to institute proceedings violated any constitutional rights," Chaney, 105 S.Ct. at 1659; see also id. at 1660 (Brennan, J., concurring), courts simply are not guided by any "meaningful standards" in the statute, regulations, or HUD guidelines by which to assess either the private owner's rejection of an applicant found "unacceptable" or HUD's refusal to take enforcement action. There is, in other words, no "law to apply." Congress has not provided for HUD review of a private owner's rejection of an applicant based on the owner's business judgment and subjective appraisal of the responsibility of the applicant. Thus, we conclude that the enforcement provisions of Section 8 do not contain "meaningful standards" sufficient to rebut the presumption of unreviewability under Sec. 701(a)(2). It follows that HUD's failure to take enforcement action against the private owners in this case is not subject to judicial review. We affirm the District Court's dismissal of plaintiffs' claim under the APA in count V of the complaint.
 
 IV.
 
 61
 For the reasons stated above, we hold that (1) plaintiffs have no "property" right to Section 8 housing benefits that entitles them to procedural due process when private owners make their tenant selections; (2) applicants for Section 8 housing and applicants for conventional public housing are not similarly situated; therefore Section 8 applicants are not denied equal protection when they are not accorded the same procedural safeguards accorded applicants for conventional public housing; (3) plaintiffs have no implied private right of action under Section 8; (4) plaintiffs have no enforceable rights as third party beneficiaries under the housing assistance payments contracts between the private owners and the federal and state housing agencies since those contracts establish no entitlement to housing for any particular applicant; and (5) HUD's failure to take action to enforce the obligations of private owners under Section 8 in regard to the tenant-selection process is not subject to judicial review under the APA. The judgment of the District Court is affirmed.
 
 
 
 [1]
 The Honorable Clyde S. Cahill, United States District Judge for the Eastern District of Missouri
 
 
 [2]
 Among the reasons stated for the denials were "inability to care for yourself," "living habits not acceptable," "home visit," "failure to cooperate in verification process," "rental reference not acceptable," and "credit report." Record at 11-12
 
 
 [3]
 The provision in Sec. 1437f(b)(2) regarding assistance payments on behalf of tenants in newly constructed or substantially rehabilitated housing was repealed in the Housing and Urban-Rural Recovery Act of 1983, Pub.L. No. 98-181, Sec. 209(a)(2), 97 Stat. 1153, 1183. Defendants concede that the repeal does not affect this case
 
 
 [4]
 There is disagreement between the parties regarding which Section 8 subprograms are at issue in this case. Plaintiffs alleged in their complaint that the two housing projects in question received assistance payments under the Section 8 New Construction subprogram, 24 C.F.R. Part 880 (1984). Defendants, however, maintain that the Hidden Valley project involves the Part 883 subprogram (under which financing for privately owned housing projects is made through public housing agencies) and that the Murphy-Blair project involves the Part 886 "Section 8 Set-Aside" subprogram (under which assistance payments are made to private owners of housing with mortgages insured by the Federal Housing Administration). Regardless of the subprograms involved, the tenant selection rights of private owners are the same for all three subprograms
 
 
 [5]
 Thus, an owner may not discriminate on the basis of race, color, religion, sex, national origin, age, or handicap. In addition, the HUD Handbook prohibits discrimination against members of certain classes. For example, an owner may not discriminate against families with children or certain socioeconomic classes (e.g., welfare recipients, single parent households, etc.). See HUD Handbook p 2-18 and Figure 2-2
 
 
 [6]
 The Handbook, however, does provide that complaints alleging violations of the nondiscrimination provisions (i.e., the fair housing and civil rights laws) must be referred to the HUD Regional Office of Fair Housing and Equal Opportunity. HUD Handbook p 2-18(c). Plaintiffs do not allege in their complaint that the private owners were guilty of any form of discrimination prohibited by federal, state, or local statute or by HUD rules or regulations in rejecting their applications
 
 
 [7]
 In Roth the Court stated that property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." 408 U.S. at 577, 92 S.Ct. at 2709. We agree with plaintiffs that in determining whether such "rules or understandings" are present in the instant case, we properly may look to the statute, the regulations, and the HUD Handbook. See Parker v. Corrothers, 750 F.2d 653, 658-61 (8th Cir.1984); cf. Perry v. Sindermann, 408 U.S. 593, 599-603, 92 S.Ct. 2694, 2698-2700, 33 L.Ed.2d 570 (1972)
 
 
 [8]
 The same provision in the regulations cited by plaintiffs in support of their argument clearly exposes the fatal weakness in their argument. That provision states that an owner "will assign the family a unit" only "if the owner [first] determines that the family is eligible and is otherwise acceptable...." 24 C.F.R. Sec. 883.704(b)(2) (1984) (emphasis added). Indeed, the following subsection provides that
 [i]f the owner determines that an applicant is ineligible on the basis of income or family composition, or if the owner is not selecting the applicant for other reasons, the owner will promptly notify the applicant in writing of the determination, the reasons for the determination, and that the applicant has the right to meet the owner or managing agent in accordance with HUD requirements.
 Id. Sec. 883.704(b)(3) (emphasis added). The broad discretion vested in the private owner, apparent from the language and the structure of the regulations, clearly distinguishes this case from Greenholtz.
 
 
 [9]
 Plaintiffs' reliance on Baker v. Cincinnati Metropolitan Housing Authority, 490 F.Supp. 520 (S.D.Ohio 1980), aff'd, 675 F.2d 836 (6th Cir.1982) and Vandermark v. Housing Authority, 663 F.2d 436 (3d Cir.1981) for the proposition that Section 8 applicants acquire a "property" interest upon proof of statutory eligibility is misplaced. Those cases dealt with the Section 8 Certificate of Family Participation "Finders-Keepers" program. The relevant regulations there required that applicants who satisfied the specific, objective eligibility criteria be issued a certificate. The Baker and Vandermark courts held that eligible applicants have a property interest in the certificate. Significantly, however, the Baker court expressly noted that a right to Section 8 housing did not attach upon issuance of the certificate. The holder of the certificate still was responsible for locating housing. Private owners retained discretion in tenant selection, and rejection by the owner may deprive the applicant of Section 8 housing even though a certificate had been issued. 490 F.Supp. at 532. Thus, a certificate holder is in exactly the same position as the plaintiff-applicants in this case. Therefore, those cases are not inconsistent with our holding, and thus lend no support for plaintiffs' position
 
 
 [10]
 A similar two-factor inquiry is made in determining whether the violation of a particular federal statute gives rise to liability under 42 U.S.C. Sec. 1983. First, has Congress, in enacting the statute, manifested in the statute itself an intent to foreclose its private enforcement through a sufficiently comprehensive remedial or enforcement scheme? Second, does the statute create substantive, enforceable rights? See Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 13-18, 101 S.Ct. 2615, 2622-25, 69 L.Ed.2d 435 (1981); Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 5-27, 101 S.Ct. 1531, 1538-44, 67 L.Ed.2d 694 (1981). In each case the inquiry focuses on congressional intent
 
 
 [11]
 Pursuant to the regulations and the contract, Hidden Valley has established its own "Resident Selection Criteria," a copy of which was attached as an exhibit to plaintiffs' complaint. Record at 22-23. The absence of any right on behalf of individual applicants to admission is specifically highlighted in that document: "The management agent is under no obligation to accept a family for occupancy. As long as written policies for resident selection exist which do not discriminate against specific classes of families, the management agent has the right to reject any applicant." Id. at 22 (emphasis in original)