Sara BALDWIN, Plaintiff,

v.

HOUSING AUTHORITY OF THE CITY OF CAMDEN, NEW JERSEY; Mirza Negron Morales; Marie Marquez, Glenn W. Barnett and Tracie Herrick, Defendants.

Civil Action No. 02–cv–05931(FLW).

United States District Court,
D. New Jersey.

Aug. 21, 2003.

As Amended Sept. 26, 2003.

David M. Podell, South Jersey Legal Services, Inc., Camden, NJ, for Plaintiff.

Anthony L. Marchetti, Esquire, Cureton Caplan P.C., Delran, NJ, for Defendants.

## OPINION

WOLFSON, District Judge.

Presently before the Court is defendants' motion to dismiss plaintiff's Complaint pursuant to Fed.R.Civ.P. 12(b)(6). In this civil rights case, plaintiff, Sara Baldwin, argues that creditworthiness is not a criterion which the Housing Authority of the City of Camden ("HACC") may properly consider in determining a lower income individual's eligibility for Section 8 assisted rental housing vouchers. In that connection, plaintiff alleges that HACC and the individually named defendants[1] deprived her of due process by denying her application for Section 8 vouchers on the basis of creditworthiness. Defendants assert that the use of creditworthiness as a criterion to evaluate applications for Section 8 vouchers is authorized by law and applicable regulations, and that their consideration of plaintiff's creditworthiness during their review of her application was appropriate. Alternatively, the individual defendants argue that they are protected from liability for any constitutional violation by the doctrine of qualified immunity and seek summary judgment on that basis. For the following reasons, defendants' motion to dismiss is denied and the individual defendants' motion for summary judgment is denied in part and granted in part.

In addition, in her Opposition to Defendants' Motion to Dismiss, plaintiff informally requests leave of the Court to amend her Complaint. The Court grants plaintiff's informal request for leave to amend her Complaint in order to proceed under 42 U.S.C. § 1983. Further, plaintiff is ordered to file such Amended Complaint within thirty days, in accordance with Section VI of this opinion.

---

1. Defendant Mirza Negron Morales ("Morales") is the designee of the Secretary of the United States Housing and Urban Development to oversee the Camden Housing Authority in place of the Board of Commissioners. Defendant Maria Marquez ("Marquez") is the Executive Director of HACC, responsible for its day-to-day management. Defendant Glenn W. Barnett ("Barnett") is Director of Section 8 & Occupancy for HACC. Defendant Tracie Herrick ("Herrick") is a HACC employee who served as the hearing officer at plaintiff's informal review hearing held September 19, 2002.

## BACKGROUND

### I. *Statutory and Regulatory Framework*

The Section 8 voucher program is part of a larger Congressionally enacted housing assistance program designed to aid lower-income individuals in securing affordable housing.[2] The program was established under federal law and is implemented pursuant to numerous federal regulations and interpretation of those regulations by local public housing authorities. In order to better understand plaintiff's argument in this case, a brief review of the Section 8 Program's statutory and regulatory framework is in order.

### A. Section 8 Program

Before the Court is the question of whether creditworthiness was a proper basis for HACC's denial of plaintiff's application for rental assistance vouchers under the Section 8 Tenant–Based Housing Choice Voucher Program ("Section 8"), one of several rent subsidy programs[3] established pursuant to Section 8 of the United States Housing Act of 1937, as amended by the Housing and Community Development Act of 1974, 42 U.S.C. § 1437f ("Housing Act"). These housing assistance programs, referred to collectively as "Section 8," were created by Congress in order to help low-income families obtain "a decent place to live" and to promote economically mixed housing.[4] Under the program, the Secretary of Housing and Urban Development ("HUD") is empowered to enter into contracts with state and local public housing agencies ("PHAs") and fund such agencies through annual contribution contracts.[5] PHAs are authorized to receive applications from eligible persons seeking housing assistance, approve or deny the applications, and then provide vouchers to approved applicants.[6] Defendant HACC is such a PHA.

### B. Quality Housing and Work Responsibility Act of 1998

In 1998, the Quality Housing and Work Responsibility Act ("QHWRA") became law.[7] Section 511 of the QHWRA requires PHAs, beginning in October 1999, to file each year, an Annual and Five Year Plan (referred to in the regulation separately and collectively as "Agency Plan[s]").[8] The same provision of the QHWRA also sets forth a list of eighteen topics a PHA must address in its Annual and Five Year Plan.[9] Among the topics on that list are eligibility, selection, and admissions poli-

---

**2.** *See generally, Franklin Tower One, L.L.C.v. N.M.,* 157 N.J. 602, 608–610, 725 A.2d 1104 (N.J.1999) (describing the Section 8 tenant-based assistance rental voucher program).

**3.** Section 8 housing assistance programs fall into two general categories: tenant-based assistance (vouchers) and project-based assistance. Tenant-based assistance is rental assistance that is not attached to a structure or particular rental unit. It is administered by a local public housing authority. Under a tenant-based assistance program, tenants are given rental assistance vouchers and then find landlords willing to accept them. The vouchers are "portable" and tenants may move to different rental units·owned by landlords willing to accept the vouchers. By contrast, pro-

ject-based assistance is linked to a specific federally-subsidized apartment. The assistance does not travel with a tenant and if a tenant moves, it is lost. *See* 42 U.S.C. § 1437f(a)-(g).

**4.** 42 U.S.C. § 1437f(a).

**5.** 42 U.S.C. § 1437f(b).

**6.** 42 U.S.C. § 1437f(*o*)(B)(6).

**7.** Pub.L. No. 105–276, 112 Stat. 2461 (October 21, 1998).

**8.** 42 U.S.C. § 1437c–1.

**9.** 42 U.S.C. § 1437c–1(d).

cies for a PHA's Section 8 voucher program.[10] QHWRA requires PHAs to conduct a public hearing and invite public comment regarding the Agency Plans [11] and also requires PHAs to establish resident advisory boards to help with the general development of the Agency Plans.[12] The Agency Plans provide a framework for local accountability.[13]

The QHWRA requires review of PHA Agency Plans by HUD.[14] If HUD does not provide written notice of disapproval within seventy-five days after a PHA submits an Agency Plan for review, the plan is presumed to be approved.[15] This presumption, however, does not preclude judicial review of HUD's approval or disapproval of a PHA Agency Plan under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, or in an action under 42 U.S.C. § 1983.[16] Additionally, QHWRA does not preclude a PHA from modifying or amending any policy, rule, regulation or plan after the PHA submits the agency plan to HUD. A significant modification or amendment, however, may not be adopted or implemented until there is consultation with the resident advisory board, public notice, a public hearing or public meeting of the board of directors, and review by HUD.[17] QHWRA and HUD do not provide a definition of "significant amendment,"

rather, determination of the definition of "significant amendment" is left to PHAs in order to facilitate local public participation in the PHA planning process.[18] Further, federal regulations implementing the Section 8 program require PHAs to identify the basic criteria for determining a substantial deviation or amendment within the Agency Plan.[19]

## C. Section 8 Administrative Plan

HUD requires PHAs to include a separate Section 8 Administrative Plan as a supporting document to the Annual Plan.[20] The Administrative Plan delineates PHA policies on matters for which the PHA has discretion to establish local policies.[21] The purpose of this requirement is to ensure public access to detailed information related to all of the housing authority's discretionary policies.[22] Section 8 implementing regulations list twenty-three policies that PHAs must address in their Section 8 Administrative Plans.[23] Among those policies is the PHA's policy for screening applicants for family behavior or suitability for tenancy. Although HUD empowers PHAs to screen applicants for Section 8 vouchers for suitability of tenancy, PHAs must conduct any such screening in accordance with the stated policies in their ad-

---

**10.** 42 U.S.C. § 1437c–1(d)(3); 24 C.F.R. § 903.7(b)(3).

**11.** 42 U.S.C. § 1437c–1(f)(1).

**12.** 42 U.S.C. § 1437c–1(e)(2).

**13.** 24 C.F.R. § 903.3(b)(1); Public Housing Agency Plans; Final Rule, 64 Fed.Reg. 56844, 56848 (October 21, 1999).

**14.** 42 U.S.C. 1437c–1(i).

**15.** 42 U.S.C. 1437c–1(i)(4)(B).

**16.** 42 U.S.C. 1437c–1(i)(4)(B).

**17.** 42 U.S.C. 1437c–1(g); 24 C.F.R. § 903.21.

**18.** Final Rule, 64 Fed.Reg. 56844, 56850 (October 21, 1999).

**19.** 24 C.F.R. § 903.7(r)(2).

**20.** 24 C.F.R. 982.54(b).

**21.** 24 C.F.R. 982.54(a).

**22.** 24 C.F.R. § 982.54; Final Rule Section 8 Tenant–Based Assistance, 64 Fed.Reg. 56893, 56897 (October 21, 1999).

**23.** 24 C.F.R. § 982.54(d).

ministrative plan.[24]

When a PHA denies or terminates assistance, it may consider all relevant circumstances, such as the seriousness of the case, the extent of participation or culpability of individual family members, mitigating circumstances related to the disability of a family member, and the effects of denial or termination of assistance on the other family members who were not involved in the action or failure.[25] When HUD recently revised this language,[26] it noted that PHAs were not required under the law, nor did HUD encourage them, to terminate or deny assistance in every circumstance when a basis for such termination or denial existed.[27] When a PHA denies assistance, an applicant is entitled to written notice and an informal review conducted by any person assigned by the PHA other than the person who made or approved the initial decision, or a subordinate of that person.[28]

## II. *Facts*

Plaintiff, Sarah Baldwin, is a thirty-three year old single mother whose sole source of income is $322 per month in public assistance payments. On Saturday, July 27, 2002, plaintiff was among more than one thousand low-income individuals who received an application for one of only three hundred new Section 8 rental assistance vouchers. Following completion of her voucher application on July 28, 2002, plaintiff submitted it to defendant HACC for consideration. On or about August 7, 2002, defendant Barnett mailed plaintiff a

letter denying her application based on her credit history. Complaint ("Compl.") at ¶ 19; Ex. 3. Plaintiff requested an administrative hearing to review the denial of her application on August 12, 2002. That hearing took place on September 19, 2002, with plaintiff represented by counsel. Defendant Herrick served as the hearing officer, and defendant Barnett was present. Compl. at ¶ 21.

During the hearing, relying on a March 20, 2002 copy of the Section 8 Administrative Plan, plaintiff's counsel challenged HACC's use of creditworthiness as a proper criterion upon which to deny plaintiff's voucher application. Compl. at ¶ 23; Ex. 6. Plaintiff alleges that defendant Barnett then produced an August 21, 2002 copy of the HACC Section 8 Administrative Plan which provided for screening and denial of applications on the basis of credit history. *Id.* In response, plaintiff argued that an Administrative Plan dated August 21, 2002, could not justify HACC's August 7, 2002 denial of her voucher application because the Administrative Plan was not effective at the time HACC denied plaintiff's application, some two weeks earlier. Compl. at ¶ 24. Plaintiff alleges that defendant Barnett "stormed out of the room" and returned shortly thereafter with a copy of a resolution of the Board of Commissioners passed in July 2002, and claimed that applicable federal regulations permitted the Board to change the Administrative Plan. *Id.* at ¶ 25. Plaintiff testified that she would not have stood in line overnight if she had known defendants

---

**24.** 24 C.F.R. § 982.307(a)(1).

**25.** 24 C.F.R. § 982.552(c)(2)(i).

**26.** The previous language stated "that the PHA has discretion to consider all of the circumstances of the case, including the seriousness of the offense, the extent of participation by family members, and the effects

that the eviction would have on family members not involved in the proscribed activity."

**27.** Response to Public Comments, Final Rule for Screening and Eviction for Drug Use and Other Criminal Activity, 66 Fed.Reg. 28776, 28782–28783 (May 24, 2001).

**28.** 24 C.F.R. § 982.554.

would use credit history as a screening criterion. Compl. at ¶ 26. Later in the hearing, plaintiff offered into evidence a letter dated August 9, 2002, from her landlord, which she alleged showed seven years of satisfactory rental history. *Id.* at ¶ 27. Plaintiff asserts that defendant Barnett instructed defendant Herrick not to admit the letter into evidence, on the basis that it was irrelevant. Compl. at ¶ 27.

On September 19, 2002, before plaintiff's receipt of written notice from HACC regarding the outcome of her administrative hearing, Barnett wrote to plaintiff's counsel to further address the topic of the propriety of HACC's use of creditworthiness as a criterion in evaluating voucher applications. Compl. at ¶ 30. Four days later, on September 23, 2002, Herrick issued a written decision upholding Barnett's denial of plaintiff's application. On September 24, 2002, plaintiff's counsel sent a letter to Barnett responding to Barnett's letter of September 19. The next day, Barnett replied in writing that the Administrative Plan had always included creditworthiness as a screening criterion and basis for denial of an application. Plaintiff alleges that this position contrasted with Barnett's earlier representations that the Board could change the Administrative Plan if it so desired. Compl. at ¶ 33. On September 26, 2002, plaintiff's counsel responded to Barnett in writing, restating counsel's argument against HACC's denial of plaintiff's application and resubmitting plaintiff's letter from her landlord regarding her satisfactory rent payment history.

On November 7, 2002, plaintiff timely filed a Verified Complaint In Lieu of Prerogative Writ pursuant to New Jersey Rules of Court 4:69 in New Jersey Superior Court and served defendants on November 15, 2002. On December 13, 2002, defendants filed a Notice of Removal and this case was removed to federal court.

On January 6, 2003, defendants filed this motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6) under L.Civ.R. 7.1(b) and Appendix N. The individual defendants also filed an alternative motion for summary judgment on the basis of qualified immunity.

Plaintiff's Complaint alleges in Count One that defendants' rejection of her Section 8 voucher application denied her due process under the 14th Amendment of the United States Constitution, as well as the Due Process Clause of the New Jersey Constitution. In Count Two plaintiff claims that the denial of her application was arbitrary, capricious and unreasonable, and constituted an abuse of discretion in violation of a clear legal duty owed to her by a governmental entity, and therefore provides grounds for an action in lieu of prerogative writ. In Count Three, plaintiff claims a violation of her rights under the Housing Act, and regulations promulgated thereunder. Specifically, she claims that PHAs may only change tenant screening for Section 8 eligibility during each year's public review and comment period on the Annual Plan. In Count Four, plaintiff claims an abuse of discretion under the Housing Act, and its implementing regulations, for failing to consider all relevant circumstances.

Plaintiff's Complaint requests a preliminary injunction and permanent injunction ordering defendant HACC, its agents, successors, and employees to provide her a Section 8 voucher, as well as compensatory damages, court costs, and any such further relief as this Court may deem appropriate. Defendants dispute plaintiff's allegations and assert that they did not violate any legal standard in applying creditworthiness as a criteria in determining plaintiff's suitability for Section 8 benefits. In the alternative, the individual defendants as-

sert that they are entitled to qualified immunity for any constitutional violations arising out of their actions in this case.

## DISCUSSION

### I. 12(b)(6) Standard

Dismissal under Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief may be granted, is appropriate only in those instances in which it appears beyond doubt that a plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989). In resolving a Rule 12(b)(6) motion, a court must focus its inquiry on the allegations in the Complaint, although matters of public record, orders, items appearing in the record of the case and exhibits attached to the Complaint may also be taken into account. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n. 2 (3d Cir. 1994) (citing *Chester County Intermediate Unit v. Penn. Blue Shield*, 896 F.2d 808, 812 (3d Cir.1990)). The reviewing court must accept as true all well pleaded allegations in the Complaint and view them in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "Since the long-established federal policy of civil litigation is to decide cases on the proofs, district courts generally disfavor Rule 12(b)(6) motions." *Port Authority of New York and New Jersey v. Arcadian Corp.*, 991 F.Supp. 390, 398 (D.N.J.1997) (citing *Melo–Sonics Corp. v. Cropp*, 342 F.2d 856 (3d Cir.1965)).

### II. Scope of Review of HACC Actions

■ The parties in this case disagree over the proper scope of this Court's review of HACC's actions. Defendants assert that the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, applies and that this Court's review of HACC's actions is thus circumscribed by the statute's narrow scope.[29] By contrast, plaintiff asserts that this Court's review of the issues in this case is not limited by the narrow scope of the Administrative Procedure Act. Rather, plaintiff argues that because HACC's actions are inconsistent with federal regulations, this Court may review those actions *de novo*. Further, plaintiff asserts that even under the scope of review established by Section 706 of the Administrative Procedure Act, because HACC's actions are not in accordance with law, this Court owes HACC no deference

---

**29.** The Administrative Procedure Act provides a vehicle through which persons aggrieved by an administrative agency action may seek judicial review thereof. 5 U.S.C. § 702. The statute requires courts to afford significant deference to agency actions and uphold them if they are "rational, based on relevant factors, and within the agency's statutory authority." *Frisby v. U.S. Dep't of Housing and Urban Dev.*, 755 F.2d 1052 (3d Cir.1985). However, the presumption of validity does not prevent a reviewing court from taking a "hard look" at an agency's actions. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The relevant statutory language provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

\* \* \*

(2) hold unlawful and set aside any agency action, findings and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\* \* \*

(C) in excess of jurisdiction, authority, or limitations, or short of statutory right. . . .

upon review of such actions.[30] I find that additional considerations compel a *de novo* standard of review here.

In *Ritter v. Cecil County*, 33 F.3d 323, 327 (4th Cir.1994), the Court of Appeals for the Fourth Circuit held that a local PHA is not an "agency" as defined by the Administrative Procedure Act.[31] At issue in *Ritter* were the interpretations of federal regulations by the Cecil County Housing Agency, a PHA established under the Housing Act, and not any HUD action. *Id.* The Fourth Circuit determined that because the Cecil County Housing Agency was "neither created nor maintained or controlled by the United States," it was a state agency and consequently, the Administrative Procedure Act did not provide the appropriate standard for review of its actions. *Id.*

■ Here, as in *Ritter*, plaintiff complains only of a PHA's interpretation of federal regulations and not the actions of HUD. In addition, like the Cecil County Housing Agency, HACC was not created, nor is it maintained or controlled, by the United States. Rather, HACC is a federally funded public housing authority organized under *state* law. *See* N.J.S.A.

52:27C–22.[32] Consequently, because HACC is a state agency, the Administrative Procedure Act does not establish the scope of this Court's review of its actions. *See Ritter*, 33 F.3d at 327; *see also*, *Clark v. Alexander*, 85 F.3d 146, 152 (4th Cir. 1996) (discussing level of deference due state agencies interpreting agency regulations under a federally created program); *Hill v. Richardson*, 7 F.3d 656, 658 (7th Cir.1993) (stating in *dicta* that Administrative Procedure Act does not apply to state governments). Instead, to the extent that HACC's actions are inconsistent with federal housing regulations or their authorizing legislation, this Court exercises *de novo* review. *Ritter*, at 327–28. If no such inconsistency exists, "the court should afford the state agency's action reasonable deference, meaning that the action should be upheld unless it is found to be arbitrary or capricious." *Clark*, 85 F.3d at 152.

### III. *Creditworthiness*

■ As an initial matter, this Court must determine whether federal regulations permit a PHA to use creditworthiness as a criterion in its determination of an applicant's eligibility for Section 8 vouchers. "An interpretation of a regula-

---

5 U.S.C. § 706.

**30.** The Court notes its agreement with plaintiff's argument that even under the scope of review established in the Administrative Procedure Act, if HACC's actions were inconsistent with federal regulations or otherwise not in accordance with law they may be set aside. 5 U.S.C. § 706(2)(a); *Frisby*, 755 F.2d at 1055–56 ("agency action not in compliance with its own regulations is fatal to such action ... [s]uch action is not in accordance with law").

**31.** The Administrative Procedure Act defines "agency" as "each authority of the United States," with some exceptions. 5 U.S.C. § 710(b)(1); *Ritter*, 33 F.3d at 327. The Fourth Circuit held that although the Cecil County Housing Agency was authorized by the Housing Act, because it was "neither cre-

ated nor maintained or controlled by the United States," it was a state agency and thus, the Administrative Procedure Act did not provide the appropriate standard of review for its actions. *Ritter*, 33 F.3d at 327.

**32.** In her Complaint, plaintiff incorrectly cites N.J.S.A. 55:14A–1 *et seq.* as the authorizing statute under which New Jersey PHAs are created. Compl. at ¶ 4. That statute was repealed by the New Jersey Legislature in 1992. L.1992, c. 79, § 59. PHA authorization is now codified at N.J.S.A. 52:27C–22. In addition, in a case interpreting the former Local Housing Authorities Law, this Court has held that New Jersey PHAs are in fact city agencies. *Jones v. Middlesex County Board of Elections*, 259 F.Supp. 931 (D.N.J.1966) (housing authority of city was a body corporate and politic, and an agency of the city).

tion presents a legal question of law to the court." *Shaw v. Philadelphia Housing Auth.*, 1991 WL 97681, *3 (E.D.Pa.1991) (interpreting former Section 8 regulation 24 C.F.R. § 882.209(d)) (citing *International Society for Krishna Consciousness, Inc. v. Rochford*, 425 F.Supp. 734 (N.D.Ill. 1977), aff'd in part, rev'd in part, 585 F.2d 263 (7th Cir.1978)). Statutory rules of construction should also be applied in interpreting regulations. *Rucker v. Wabash Railroad Co.*, 418 F.2d 146 (7th Cir.1969). The plain language of a regulation and the ordinary meanings of the words should be given effect unless there is an apparent ambiguity or an expression of legislative intent to the contrary. *Bread Political Action Committee v. Federal Election Commission*, 455 U.S. 577, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982).

Though it appears no court has reached this specific question, this Court reads the broad language of the Housing Act's implementing regulations to permit the use of creditworthiness as a screening criterion available to PHAs evaluating voucher applications. Specifically, 24 C.F.R. § 982.307, which deals directly with tenant screening, provides:

(a) PHA option and owner responsibility:

(1) The PHA has no liability or responsibility to the owner or other person for the family's behavior or suitability for tenancy. However, the PHA may opt to screen applicants for family behavior or suitability for tenancy. The PHA must conduct such screening of applicants in accordance with policies stated in the PHA administrative plan.

(emphasis added). While the phrase "suitability for tenancy" is undoubtedly open to broad interpretation, it contains no apparent ambiguity. In the absence of evidence of legislative intent to the contrary, this Court interprets the term "suitability for tenancy," as used in 24 C.F.R. § 982.307, as evidence of the Secretary of Housing and Urban Development's intent to establish a broad scope of criteria available to PHAs which undertake to screen voucher applicants. Indeed, it seems quite reasonable that a PHA interpreting 24 C.F.R. § 982.307 might logically find creditworthiness and one's ability to pay rent implicit in the concept of "suitability for tenancy."

Moreover, as discussed on page 383, *infra*, HACC's proposed Annual Plan for fiscal year 2003, which was amended to specifically add creditworthiness as a screening criterion, was approved by HUD on December 2, 2002. *See* Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss ("Pl.Br."), Ex. 5 at "HUD Select Approved Plans" Attachment. HUD's approval of HACC's 2003 Annual Plan, with the addition of creditworthiness as a screening criterion, supports this Court's determination that 24 C.F.R. § 982.307 permits a PHA to screen applicants for Section 8 vouchers on the basis of creditworthiness. If "suitability for tenancy," as used in § 982.307, did not encompass creditworthiness and such a screening criterion were flatly impermissible, as plaintiff suggests, it seems likely that HUD, the agency responsible for administration of the Section 8 program, would so indicate by rejecting such an addition to a PHA's Annual Plan. Here, HUD did not do so. Its approval of HACC's 2003 Annual Plan is additional evidence that § 982.307 does not prevent a PHA from screening applicants on the basis of creditworthiness.

In an attempt to resolve this threshold question, the parties direct the Court to two cases decided under New Jersey law. Predictably, however, the parties disagree as to whether either case supports a PHA's use of creditworthiness as a criterion in evaluating Section 8 applications. Albeit neither case addresses the unique

question presented here, nonetheless, a brief discussion of the cases cited by the parties and their respective contentions is in order.

Defendants assert in an almost deceptively short statement that "[t]enant screening under New Jersey law may include creditworthiness of the applicant," and cite *T.K. v. Landmark West* for support. 353 N.J.Super. 223, 224, 802 A.2d 527 (App.Div.2002)[33]; Defendants' Brief in Support of Motion To Dismiss ("Def.Br.") at p. 8. In *Landmark*, the New Jersey Superior Court, Appellate Division, considered an appeal from a trial court's ruling that a landlord violated a New Jersey anti-discrimination law when he used creditworthiness as a pretext to improperly reject an application from a prospective tenant because of her participation in the Section 8 program. *Id.* The Appellate Division affirmed the trial court and commented that while N.J.S.A. 2A:42–100 made it unlawful for a landlord to " 'refuse to rent or lease any ... apartment to another person because of the source of any lawful income,' it does not limit a landlord from refusing to rent an apartment based on the 'creditworthiness' of the prospective tenant." *Landmark* at 225, 802 A.2d 527. *Landmark* did not involve a PHA's screening process for voucher applicants. The issue of creditworthiness arose only when the private landlord asserted that he rejected the plaintiff's application for tenancy because of her poor credit rather than on the basis of her intent to pay rent using Section 8 vouchers. *Id.* The Appellate Division's statement that the statute at issue in *Landmark*, which has since been repealed,[34] did not prohibit a landlord from considering creditworthiness in screening potential tenants is of limited value to this Court in determining whether federal regulations permit a PHA to screen applicants for federal housing assistance on the basis of creditworthiness.

In response to defendants' reliance on *Landmark*, plaintiff cites the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–12g(4), and explains that, fourteen days before plaintiff's September 19, 2002 administrative hearing, the New Jersey Legislature substituted that section of the NJLAD for N.J.S.A. 2A:42–100, the statute relied upon by the Appellate Division in *Landmark*. Plaintiff also directs the Court to the unpublished case, *Dannell Reed v. Rustic Village Apartment,* Docket No. DC–4136–02M, decided January 14, 2003, by the New Jersey Superior Court, Law Division. In *Reed*, the court noted that the newly enacted statute, N.J.S.A. 10:5–12g(4), does not contain the following language from the former N.J.S.A. 2A:42–100: "Nothing contained in this section shall limit the ability of a person, firm, corporation or any agent, officer, or employee thereof to refuse to rent or lease any house or apartment because of the creditworthiness of the person or persons seeking to rent a house or apartment." Plaintiff argues that the *Reed* court interpreted this statutory change as evidence of

---

**33.** Although *Landmark* held that a New Jersey landlord may consider a prospective tenant's creditworthiness in deciding whether or not to rent property to the tenant, that holding is of limited value in resolving the question extant here. The Court assumes that defendants intended only to draw an analogy between a permissible screening criterion New Jersey landlords may employ while reviewing applications from prospective tenants, and

those criteria, authorized by federal regulation, available to a PHA screening applicants for federal housing assistance.

**34.** This section concerning sources of lawful income or rent payment as grounds for refusal to rent or lease was repealed by the New Jersey Legislature, effective September 5, 2002. *See* P.L.2002 c. 82, § 7.

the New Jersey Legislature's intent to prohibit landlords from using creditworthiness as a basis for denying applications from prospective tenants. Pl. Br. at p. 22 (citing *Reed*, Slip Opinion at pages 9–10).

Even if this Court were to determine, which it need not, that the Appellate Division's interpretation of the repealed statute in *Landmark* has been superseded by the *Reed* court's interpretation of the new statute, the NJLAD section at issue in *Reed* pertains only to "the owner, lessee, sublessee, assignee or managing agent of, or other person having the right of ownership or possession of or the right to sell, rent, lease, assign, or sublease any real property or part or portion thereof, or any agent or employee of any of these." N.J.S.A. 10:5–12g(4). The statute does not reach a PHA undertaking to screen applicants for federal housing assistance vouchers which are later to be presented to landlords as payment for rent. In fact, nothing is said in *Landmark*, *Reed*, or the NJLAD of what criterion a PHA may use in deciding who receives vouchers. Rather, the cases and statutes discussed by the parties focus on the issue of discrimination against prospective tenants by individual landlords on the basis of that potential tenant's participation in the Section 8 housing program or otherwise on the basis of source of income. Here, HACC is not a residential landlord. In sum, the cases and statutes cited by the parties do not address the question of whether federal regulations permit a PHA to use creditworthiness as a screening criterion in evaluating applications for vouchers under the Section 8 program.

As stated earlier, this Court interprets 24 C.F.R. § 982.307, the relevant HUD regulation, to permit a PHA to use creditworthiness as a criterion in screening voucher applications to ensure suitability of tenancy. That determination does not end the Court's analysis of the issues in this case, however, because even if federal regulations permit a PHA to screen applicants for vouchers on the basis of creditworthiness, those regulations also set forth specific procedures which must be followed in the adoption of such a policy by a PHA. As the basis of her claims, plaintiff alleges that HACC failed to comply with the relevant statutory and regulatory provisions and thus denied her due process and violated the Housing Act. I now turn to the specific claims asserted by plaintiff.

## IV. Due Process

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., Amend. XIV, § 1. Essentially, due process requires that a person be given notice and an opportunity to be heard prior to an adverse action. *Goldberg v. Kelly*, 397 U.S. 254, 267–68, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). When a plaintiff alleges that state actors have failed to provide procedural due process, a court must determine "whether the asserted individual interests are encompassed within the fourteenth amendment's protection of 'life, liberty, or property'"; if such protected interests are implicated, a court must then "decide what procedures constitute 'due process of law.'" *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir.2000) (citing *Robb v. City of Philadelphia*, 733 F.2d 286, 292 (3d Cir.1984)). The United States Supreme Court has explained that " 'liberty' and 'property' are broad and majestic terms. They are among the 'great (constitutional) concepts ... purposely left to gather meaning from experience....'" *Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Consequently, the Supreme Court has not attempted to define with exact precision the liberty or property interests guaran-

teed by the Due Process Clause. *See id.* at 572, 92 S.Ct. 2701.

A protected liberty interest may arise directly from the Constitution or from federal or state statutes or regulations. *See Stephany v. Wagner,* 835 F.2d 497, 499 (3d Cir.1987), cert. denied, 487 U.S. 1207, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988). Property interests are not created by the Constitution, but "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents,* 408 U.S. at 577, 92 S.Ct. 2701. In order to create a property interest, a statute must contain "explicitly mandatory language, i.e. specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 463, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). Even where an intent to bestow a benefit on private individuals is clear, however, a statutory requirement that certain procedures be observed before a benefit can be withdrawn does not in itself create a protected property interest. *Stephany,* 835 F.2d at 500; *see also Olim v. Wakinekona,* 461 U.S. 238, 250–51, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983);. Thus the fundamental question in deciding whether an applicant for benefits possesses a protectable property interest in those benefits, despite the fact that the applicant is not currently receiving the benefits, is whether or not the particular statute places substantive limits on official discretion in favor of the applicant. *See Olim,* 461 U.S. at 249, 103 S.Ct. 1741. Put another way, the applicant "must show that particularized standards or criteria guide the [government's] decisionmakers" in order to claim protection under the due process clause. *Olim,* 461 U.S. at 249, 103 S.Ct. 1741; *Specter v. Garrett,* 971 F.2d 936, 955 (3d Cir.1992), judgment vacated on other grounds, 506 U.S. 969, 113 S.Ct. 455, 121 L.Ed.2d 364 (1992).

### A. Property Interest in Section 8 Voucher

■ Defendants argue that plaintiff cannot establish a property interest in Section 8 vouchers for which she is merely an applicant and not currently receiving the benefit of the voucher. Def. Br. at p. 12, n. 4. Though the Third Circuit has not definitively held to the contrary, it has in certain circumstances, as have other courts, accorded procedural due process protection to applicants for benefits who did not have present enjoyment of the benefit. *Kelly v. Railroad Retirement Board,* 625 F.2d 486 (3d Cir.1980) (applicant for disabled child's annuity under Railroad Retirement Act); *Raper v. Lucey,* 488 F.2d 748 (1st Cir.1973) (applicant for driver's license); *Ressler v. Pierce,* 692 F.2d 1212 (9th Cir.1982) (applicants for Section 8 Housing program benefits); *Butland v. Bowen,* 673 F.Supp. 638 (D.Mass. 1987) (applicant for Social Security disability benefits); cf. *Vandermark v. Housing Authority of City of York,* 663 F.2d 436 (3d Cir.1981) (applicant for Section 8 benefits stated due process claim) [35]. In those

---

**35.** In *Vandermark,* the Court of Appeals for the Third Circuit considered a due process claim brought by a plaintiff seeking review of a PHA's determination that he was ineligible to receive a certification for Section 8 housing benefits. *Vandermark,* 663 F.2d at 438. While silent on the issue of whether the plaintiff possessed a property interest in the certification, the court's consideration of the case implies its determination that such a threshold matter was satisfied, and it has been so interpreted. *See Eidson v. Pierce,* 745 F.2d 453, 461 n. 6 (7th Cir.1984).

cases, as in the case at bar, the defendants denied plaintiffs' eligibility to receive the benefits for which they applied and the plaintiffs claimed that they were not provided adequate procedural protection in the denial process.

Of particular note is *Ressler v. Pierce,* where the Court of Appeals for the Ninth Circuit held that applicants have a constitutionally protected property interest in Section 8 benefits entitling them to the safeguards of procedural due process in the application and tenant-selection process. *Ressler,* 692 F.2d at 1214–16. The Ninth Circuit based it holding on two factors. First, the court noted that the relevant actors in the case had only limited discretion in the Section 8 application and selection process. *Id.* at 1215. In so doing, the court distinguished one of its earlier decisions wherein it found no property interest during the application process for benefits because the entity charged with dispensing the governmental benefits had "unbridled discretion" in the selection process. *Id.* (distinguishing *City of Santa Clara v. Andrus,* 572 F.2d 660 (9th Cir. 1978)). In contrast, the *Ressler* court stated that the regulations and HUD Handbook guidelines "closely circumscribe" the actor's discretion in the Section 8 tenant-selection process. 692 F.2d at 1215. Second, *Ressler* found a property interest in Section 8 benefits "by virtue of [an applicant's] membership in a class of individuals whom the Section 8 program was intended to benefit." *Id.*

The Ninth Circuit's reasoning in *Ressler* was questioned in two cases decided by the Courts of Appeals for the Seventh and Eighth Circuits. Though they present related issues, both cases are distinguishable from the case at bar. In *Eidson v. Pierce,* 745 F.2d 453 (7th Cir.1984) and *Hill v. Group Three Housing Dev. Corp.,* 799 F.2d 385 (8th Cir.1986), the Seventh and Eighth Circuits each held that while a plaintiff may possess a property interest in certification for Section 8 benefits during the application process, once he receives such certification he does not possess a property interest in a particular residence; thus a lawful decision by a private owner not to rent to an otherwise eligible program participant does not deny that plaintiff due process. *Hill v. Group Three Housing Dev. Corp.,* 799 F.2d 385 (8th Cir.1986); *Eidson v. Pierce,* 745 F.2d 453 (7th Cir.1984). Unlike the case here, which is concerned with HACC's denial of plaintiff's application for eligibility to participate in the Section 8 program, both *Hill* and *Eidson* involved the due process dimensions of an otherwise eligible plaintiff's application to rent particular housing owned and operated by private owners. *Hill,* 799 F.2d at 386–87; *Eidson,* 745 F.2d at 454. In both cases, the plaintiffs were statutorily eligible to participate in the Section 8 program but were denied tenancies by private owners selecting among eligible applicants. *Hill,* 799 F.2d at 387; *Eidson,* 745 F.2d at 460–61. In both *Hill* and in *Eidson,* "plaintiffs claimed not the opportunity to prove their eligibility but instead entitlement to the benefits themselves," and the Seventh Circuit noted that such a plaintiff asserts "broader property rights" than those asserted by a plaintiff attempting to prove mere eligibility. *Eidson,* 745 F.2d at 461 n. 6. Here, plaintiff seeks review of an initial determination of ineligibility to participate in the Section 8 program, not denial of an asserted entitlement to particular housing. Such a distinction sets this case apart from *Hill* and *Eidson* and closer to the facts presented in *Vandermark* and *Ressler.*

Here, as in *Ressler,* HACC retains only limited discretion to establish eligibility requirements for participation in the Section 8 tenant-based assistance program. The limits of that discretion are established by

law and HUD implementing regulations. *See* 42 U.S.C. § 1437c–1; 24 C.F.R. § 982.307. Furthermore, the Housing Act was designed to assist low-income individuals in obtaining adequate housing. 42 U.S.C. § 1437f(a). Plaintiff, a single mother whose sole source of income is less than $300 per week in public assistance, is unquestionably among those the Act was designed to benefit. The Ninth Circuit's reasoning in *Ressler* closely tracks the Third Circuit's guidance in *Specter*, regarding when a statute creates a property interest entitled to the protections of procedural due process. Moreover, as the Third Circuit held in *Kelly*, "due process must attach to the process of determining ineligibility, whether at the outset or after the receipt of benefits." *Kelly*, 625 F.2d at 490. Thus, for the foregoing reasons, this Court holds that plaintiff possesses a property interest in the Section 8 vouchers at issue, sufficient to satisfy the first of the two threshold requirements to state a due process claim. I will now determine whether plaintiff properly alleges a denial of her protected property interest without proper notice or process.

Assuming federal regulations permit a PHA to screen applicants for Section 8 vouchers on the basis of creditworthiness, plaintiff argues that such a screening criterion was not contained in HACC's March 2002 Administrative Plan when defendants determined plaintiff ineligible for Section 8 vouchers, and was only added as an amendment in July 2002. Therefore, plaintiff argues that defendants' rejection of her application denied her due process under the United States Constitution, and the New Jersey Constitution. In addition, plaintiff asserts that the absence of creditworthiness as a screening criterion in the statutorily required HACC 2002 Annual Plan, and that HACC did not adopt creditworthiness as a screening criterion until the 2003 Plan, evidences that such a criterion could not have existed in any previously dated version of the HACC Administrative Plan, which is a supporting document to the Annual Plan. Further, plaintiff asserts that an amendment to the fundamental eligibility standards for participation in the Section 8 program constitutes a "significant amendment" under the relevant regulations, triggering a required notice and comment period. Plaintiff argues that defendants failed to subject the July 2002 proposed amendment to public notice and comment as required, and therefore, the new screening criterion was never properly adopted by HACC, and could not be lawfully applied to plaintiff.

Defendants assert that creditworthiness did, in fact, exist as a screening criterion in HACC's March 2002 Administrative Plan and that the July 2002 amendment of the Administrative Plan merely clarified HACC's already existing discretion to deny eligibility for benefits on the basis of creditworthiness. At the same time, defendants argue that even if the July 2002 amendment adopted creditworthiness as a screening criterion in the Administrative Plan for the first time, the amendment did not constitute a "significant amendment" triggering the notice and comment requirement set forth in HUD regulations. Thus, defendants assert, their denial of plaintiff's application was proper and this Court should dismiss her claims. The Court first examines the pertinent HACC plans.

**B. Annual Plan and Administrative Plan Inconsistencies**

█ Pursuant to the Quality Housing and Work Responsibility Act of 1998, each year a PHA must file an Annual Plan with HUD. 42 U.S.C. § 1437c. The contents of the Annual Plan must include, among other things, "[a] statement of the policies governing eligibility, selection, admissions

(including any preferences), assignment, and occupancy of families with respect to public housing dwelling units and housing assistance...." 42 U.S.C. § 1437c–1(d)(3). Additionally, 24 C.F.R. § 982.54 requires PHAs to "adopt a written administrative plan that establishes local policies for administration of the program in accordance with HUD requirements" and which establishes PHA policy for "[i]ssuing or denying vouchers...." The Administrative Plan is a supporting document to the Annual Plan. *Id.*; 24 C.F.R. § 903.4.

HACC's Annual Plan for Fiscal Years 2000 through 2002 did not expressly include creditworthiness as a screening criterion for applicants seeking Section 8 assistance.[36] In each of those years, Section 3.B.(1) of the HACC Annual Plan, which covers eligibility for Section 8 vouchers, included check-boxes which HACC could mark to indicate the grounds upon which it intended to screen applicants for eligibility. *See* Pl. Br., Ex. 1 at p. 19; Ex. 2 at p. 10; Ex. 3 at p. 18. In all of those years, HACC marked only the box indicating that it would screen for criminal and drug related activity. *Id.* Furthermore, in each of those years, the HUD template [37] also provided additional boxes a PHA could mark to indicate its adoption of additional screening criteria, *id.*, yet from 2000 through 2002, HACC did not check the additional box and did not indicate its intention to employ any other screening basis in its Annual Plan. *Id.*

A PHA's Administrative Plan is a supporting document of its Annual Plan. 25

C.F.R. 903.4. While the Annual Plan in effect at the time HACC denied plaintiff's application, and those for the two years prior, did not list creditworthiness as a screening criterion for eligibility, defendants argue that HACC's March 2002 Administrative Plan *did* provide for screening on the basis of creditworthiness. Section 3.2F of defendant HACC's March 2002 Administrative Plan reads:

> Suitability for tenancy. The Camden Housing Authority determines eligibility for participation and will also conduct criminal, **credit**, and rental history checks on all adult household members, including live-in aides. The Camden Housing Authority will deny assistance to a family because of drug related criminal activity or any other criminal activity by family members that the Camden Housing Authority deems significant or serious enough to deny admission.

(emphasis added). Defendants argue that because the Administrative Plan provided that HACC would perform credit checks, plaintiff's Complaint must fail, because there would be no point in conducting credit checks if not to screen applicants for creditworthiness. This Court disagrees. Merely providing for credit screening is not the same as declaring that applicants will be denied assistance based on creditworthiness. For example, credit checks will reveal a past eviction, which is one of the fifteen enumerated grounds in the Administrative Plan for denying an application for Section 8 vouchers. Employing a

---

**36.** The Fiscal Year 2002 Annual and Five Year Plan was in effect when plaintiff applied for vouchers on July 28, 2002, when Defendant Barnett initially denied her application on August 7, 2002, and at the time of the administrative hearing on September 19, 2002.

**37.** The United States Department of Housing and Urban Development provides PHAs with

blank templates for completion and submission, which serve as the Annual and Five Year Plans. The templates address all of the statutorily required information a PHA must report and each PHA completes the template in accordance with its particular situation. *See* 64 Fed.Reg. 56844.

credit check to identify the existence of any outstanding debts to other PHAs or prior evictions might reasonably be the only purpose of conducting such a check.[38]

Further, the language of Section 3.2F of the March 2002 Administrative Plan states that an application will be denied on the basis of drug related or other criminal activity but is silent as to whether denial of an application may result from HACC's assessment of an applicant's credit history. Moreover, defendants ignore the logical inconsistency of their argument that the Administrative Plan accomplishes what the Annual Plan does not. As already discussed, over the course of three consecutive years, the HACC Annual Plan, a document required under federal law, did not include creditworthiness as a screening criterion to determine applicant eligibility. Defendants argue, nonetheless, that the ambiguous language of Section 3.2F of the March 2002 Administrative Plan included such a criterion, and thus, cured the effect of the absence of any mention of creditworthiness as a screening criterion in the Annual Plan. Such an argument, on its own, fails to survive careful analysis, however, given the subsequent amendment of both HACC's Annual Plan and the supporting Administrative Plan *specifically adding* creditworthiness as a basis for denial of Section 8 benefits. Thus, I reject defendants' argument that creditworthiness was always a criterion available to HACC in screening applicants for eligibility for assistance.

## C. Subsequent Amendment to Annual and Administrative Plans

 In July 2002, the HACC Board of Commissioners passed a resolution adding the following language to Section 3.2F of the Administrative Plan, addressing applicant eligibility:

> Denial for admission for drug related criminal activity or any other criminal activity will be based on the activities done in the previous 5 years, but HACC reserves the right to deny admission of [sic] or such activities that were undertaken for periods beyond 5 years where the severity of or the showing of a pattern exists.
>
> On credit history, HACC may deny admission for, but not limited to, multiple accounts in collections, bankruptcies, liens, or multiple accounts with late payment histories of 90 or more days.
>
> On rental history, HACC may deny admission for, but not limited to, any court filings for lease violations, and any other court filings, which relate to an applicant's rental history. The rental history shall be judged based on the previous 5 years, but HACC reserves the right to extend the period of years where a pattern exists or the volume of filings justifies the extended time period.

*See* Compl., Ex. 6 at p. 18. Defendants characterize this additional language as a mere "amplification" of the already available screening criteria. Defendants' Brief in Reply to Plaintiff's Opposition to the Motion to Dismiss ("Def.Reply") at p. 11. To the contrary, this Court reads the lan-

---

**38.** Section 4.8 of the Administrative Plan is entitled "Grounds for Denial." Among the criteria triggering mandatory denial are parties who "[c]urrently [owe] rent or other amounts to any housing authority in connection with public housing or Section 8 programs" (subsection F), as well as those who "[h]ave been or ... will be ... evicted from their current place of dwelling for non-pay-ment of rent or for a cause eviction ...." (subsection O). Certainly, these sections are referring to types of creditworthiness, but are specifically directed to rental or housing situations, and denial based on these criteria is permissible. This Court concludes that using specific types of creditworthiness as criteria is not the same as using creditworthiness generally as a basis for screening.

guage of the amendment to the Administrative Plan as an explicit adoption of creditworthiness as a basis for denial of an application for vouchers rather than clarifying or elaborating any already existing eligibility standard. This conclusion is supported by the fact that creditworthiness never appears as a screening criterion in the HACC Annual Plan prior to 2003. As the HACC Administrative Plan is a supporting document to the Annual Plan and creditworthiness does not appear in the Annual Plan as a screening criterion until 2003, it follows that the July 2002 Amendment to the Administrative Plan adopts creditworthiness as an eligibility requirement where it had not previously existed, rather than merely clarifying an existing standard.

It was not until late in 2002, that HACC sought to amend its Annual Plan to adopt creditworthiness as a screening criterion to determine applicant eligibility. Unlike previous years, in the 2003 Annual Plan, HACC marked the "other" box in Section 3.B(1) covering eligibility requirements, indicating additional screening criteria beyond those offered on the HUD template. *See* Pl. Br., Ex. 4 at p. 20. As required, HACC listed "Credit Report Status and Rental History Checks" as additional screening criteria. *Id.* HUD approved HACC's 2003 Annual Plan on December 2, 2002. *See* Pl. Br. Ex. 5 at "HUD Select Approved Plans" Attachment.

Having determined that the July 2002 amendment to the HACC Administrative Plan adopted creditworthiness as a basis for denial of an application for housing assistance vouchers where no such eligibility requirement previously existed, and that the 2003 Annual Plan was amended to include an applicant's creditworthiness as

a screening criterion, the Court now examines the effect of such amendments.

## D. Effect of Amendment to Annual Plan

■ Defendants argue that this dispute reduces to two questions: (i) whether or not a PHA may use credit history as a screening criterion for Section 8 applicants;[39] and (ii) whether or not HACC had "the ability to make the July 2002 modification" to its Administrative Plan. Def. Reply at p. 1. Defendants assert that even were creditworthiness not a screening criterion included in HACC's Administrative Plan prior to its modification, the July 2002 amendment occurred well before their denial of plaintiff's application for benefits, and thus denial on the basis of creditworthiness was proper. Further, defendants assert that the July 2002 amendment to the Administrative Plan was not a "significant amendment" triggering a required notice and comment period and thus plaintiff's Complaint must be dismissed. Plaintiff, however, responds that the July 2002 amendment was a "significant amendment" to the HACC *Annual Plan* triggering the statutorily required notice and comment period. While the July 2002 revision of the Administrative Plan may well have been significant, the statute and HUD regulations dealing with significant amendments and modifications which trigger a notice and comment period apply to the Annual Plan, not the Administrative Plan. *See* 42 U.S.C. 1437c–1(g)(2); 24 C.F.R. 903.21. As such, defendants' focus on the July 2002 amendment to the HACC Administrative Plan as the dispositive issue in this case is misplaced. As the Court has stated above, the Administrative Plan is a supporting document to the An-

---

**39.** This Court has already determined that the first question must be answered in the affir-
mative. *Supra,* p. 376.

nual Plan and HACC's July 2002 revisions to it evidence the significance of the modification to the 2003 Annual Plan which changed the eligibility standards for participation in the tenant-based assistance Section 8 program.

42 U.S.C. § 1437c–1(g)(2),[40] dealing with consistency and notice of amendments and modifications to PHA plans, requires that:

Each significant amendment or modification to a public housing agency plan submitted to the Secretary under this section shall—

(A) meet the requirements under subsection (c)(2) (relating to consultation with resident advisory board and consistency with comprehensive housing affordability strategies); and

(B) be subject to the notice and public hearing requirements of subsection (f).

The statute is silent as to what changes constitute a "significant amendment or modification." Instead, federal regulations require that each PHA is to establish its own definition of "significant amendments or modifications" and set forth that definition in its Annual Plan. 24 C.F.R. 903.7(r)(2).

In HACC's 2002 Annual Plan, which was in effect at the time defendants denied plaintiff's application, HACC did not include a definition of "significant amendment or modification" nor did it list any criteria that it would use to determine what constitutes such changes.[41] *See gen-*

---

**40.** Subsection (f) provides:

Hearing and notice requirement.

(1) In general. In developing a public housing agency plan under this section, the board of directors or similar governing body of a public housing agency shall conduct a public hearing to discuss the public housing agency plan and to invite public comment regarding that plan. The hearing shall be conducted at a location that is convenient to residents.

(2) Availability of information and notice. Not later than 45 days before the date of a hearing conducted under paragraph (1), the public housing agency shall—

(A) make the proposed public housing agency plan and all information relevant to the hearing and proposed plan available for inspection by the public at the principal office of the public housing agency during normal business hours; and

(B) publish a notice informing the public that—

(i) that the information is available as required under subparagraph (A); and

(ii) that a public hearing under paragraph (1) will be conducted.

(3) Adoption of plan. A public housing agency may adopt a public housing agency plan and submit the plan to the Secretary in accordance with this section only after—

(A) conducting a public hearing under paragraph (1);

(B) considering all public comments received; and

(C) making any appropriate changes in the public housing agency plan, in consultation with the resident advisory board.

(4) Advisory board consultation enforcement. Pursuant to a written request made by the resident advisory board for a public housing agency that documents a failure on the part of the agency to provide adequate notice and opportunity for comment under this subsection and a finding by the Secretary of good cause within the time period provided for in subsection (i)(4), the Secretary may require the public housing agency to adequately remedy such failure before final approval of the public housing agency plan under this section.

**41.** The PHA Plan template issued by HUD does not include a space for the required definition, therefore, PHAs must submit the required definition as an attachment to the Plan. *See* HUD Notice PIH 99–51(HA) available at: **http://www.hud.gov/offices/pih/**publications/notices/99/ pih99 51.pdf (last visited August 10, 2003). HACC was not required to include a definition of "significant amendment or modification" in its original Annual Plan for Fiscal Year 2000. *Id.* at p. 4 ¶ G. Curiously, HACC did not include the required definition in its 2001 or 2002 Annual Plans. *See generally,* Pl. Br. Exs. 1, 2, and 3.

*erally* Pl. Br. Ex. 1, 2, and 3. In its 2003 Annual Plan, HACC included, for the first time, the following definition of "significant amendment or modification":

> Substantial deviation or significant amendment or modifications are defined as discretionary changes in the plans or policies of the housing authority that fundamentally change the mission, goals, objectives, or plans of the agency and which requires [sic] formal approval of the Board of Commissioners.

Pl. Br. Ex. 4 at unnumbered final page of Fiscal Year 2003 Annual Plan. Defendants argue that this language is the touchstone from which the Court should weigh the significance of its addition of creditworthiness as a screening criterion for eligibility to participate in the Section 8 program. This Court disagrees. The definition of "significant amendment or modification" cited above is taken from HACC's 2003 Annual Plan. Nowhere in any of HACC's previous Annual Plans is such a definition offered. As noted earlier, HACC's 2002 Annual Plan, applicable in this case, does not contain the same—or any other—definition of "significant amendment" as that which appears in the 2003 Annual Plan. Defendants may not evaluate an action using a definition that did not exist at the time the action was taken. In the absence of proper guidance from HACC, the Court is left to determine whether the addition of creditworthiness as a screening criterion in HACC's 2003 Annual Plan constitutes a "significant amendment" to its Annual Plan.

In a notice transmitting additional instructions to PHAs regarding compliance with the requirements of regulations pertaining to Agency Plans found at 24 C.F.R 903, HUD issued the following declarations regarding what it considered "significant amendments" sufficient to trigger the requirements of 42 U.S.C. § 1437c–1(g). "Until a January or April PHA has met the requirement to define 'significant amendment or modification,' in the PHA Plan, HUD will consider ... changes in rent or admissions policies" to be significant amendments or modifications. *See* HUD Notice PIH 99–51(HA) available at: **http://www.hud.gov/offices/pih/** publications/notices/99/ pih99–51.pdf (last visited August 10, 2003).[42]

██ Here, HACC's addition to the criteria it will employ to screen applicants for Section 8 vouchers is a significant change from its previous admission policies. The gravity of that change is illustrated by the July 2002 Amendment to the Administrative Plan to adopt creditworthiness as a basis for denial of an application for assistance. Such a decision to include creditworthiness as a criterion for rejecting voucher applications where no such criterion existed before, strikes the Court as a significant modification. Addition of such a screening criterion and its use as a basis for denial of benefits dramatically alters the application process. Such a change fundamentally impacts who may qualify for eligibility for benefits from 2002 to 2003. In addition, HACC's changes to the eligibility requirements also encompassed a revision of its Administrative Plan. As the

---

**42.** Notice PIH 99–51(HA) was issued on December 14, 1999 and expired on December 31, 2000. It was designed to clarify information for PHAs during the initial Agency Plan submission process. Nonetheless, because HACC never included a definition of "significant amendment or modification" with any of its Annual Plans prior to 2003, the language of Notice PIH 99 51(HA) provides a useful baseline from which to evaluate amendments challenged as significant modifications. A "January or April PHA" refers to the initial filing date for a PHA based on the start of its fiscal year. *Id.* HACC is a "January PHA." *See* Pl. Br. Ex. 1 at p. 1.

Court has discussed, such a revision is evidence of the serious nature of the amendment to the Annual Plan because formal approval of the Board of Commissioners is required to alter the Administrative Plan. *See* 24 C.F.R. § 982.54 ("any revision of the [administrative] plan must be formally adopted by the PHA Board of Commissioners").

In sum, based on the allegations in plaintiff's Complaint, the decision to amend the 2003 Annual Plan to include creditworthiness as a screening criterion, and the pendant revisions to the Administrative Plan, reflect that this criteria change constitutes a significant amendment to HACC eligibility policies. If plaintiff can prove her allegations, then she may be able to show that HACC violated the Housing Act and its implementing regulations by failing to comply with the QHWRA's requirements to consult with resident advisory board members about the modification and provide for public notice and comment. *See* 42 U.S.C. § 1437c–1(g); 24 C.F.R. 903.21. While plaintiff's due process argument requires the negotiation of a labyrinthine maze of statutes and regulations, its complexity does not negate its merit. Thus, I find that plaintiff successfully states a due process claim arising out of defendants' denial of her application for Section 8 benefits on the basis of creditworthiness.

### E. Abuse of Discretion

■ Even if HACC's amendment to the 2003 Annual Plan is not a "significant amendment" triggering the notice and comment period required by 42 U.S.C. § 1437c–1(g), based on the allegations in plaintiff's Complaint, she may be able to prove that defendants' conduct during her informal administrative hearing constituted an abuse of discretion sufficient to provide an independent basis for a due process claim. A judgment is said to be an abuse of discretion if the adjudicator has failed to exercise sound, reasonable, and legal decision-making skills. *See, e.g., Wilton v. Seven Falls Co.,* 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995); *General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Moreover, "the very notion of a hearing, however informal, connotes that the decision maker will listen to the arguments of both sides before basing a decision on the evidence and the legal rules adduced at the hearing." *Billington v. Underwood,* 613 F.2d 91, 95 (5th Cir.1980) (finding conduct of PHA officials during informal review failed to satisfy regulation's requirements and denied plaintiff due process) (citing *Goldberg,* 397 U.S. at 271, 90 S.Ct. 1011; *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *Wong Yang Sung v. McGrath,* 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950); *Ohio Bell Telephone Co. v. Public Utilities Com'n,* 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937)).

HUD regulations clearly state that a review of an adverse decision "may be conducted by any person or persons designated by the PHA, **other than a person who made or approved the decision under review** or a subordinate of this person." 24 C.F.R. 982.554(b)(1) (emphasis added). Further, the same regulation requires that the "applicant must be given an opportunity to present written or oral objections to the PHA decision." *Id.* at (b)(2). Plaintiff's Complaint alleges that defendant Barnett unduly influenced defendant Herrick while the latter was serving as the hearing officer at plaintiff's administrative hearing. Barnett initially denied plaintiff's application in a August 7, 2002 letter. Compl. at ¶ 19; Ex. 3. Barnett instructed Herrick not to accept evidence offered by plaintiff showing seven years of satisfactory rental payment

history which plaintiff asserts supported her contention that her credit rating did not adequately reflect her "suitability for tenancy" and eligibility to participate in the Section 8 program. Compl. at ¶ 26.

Barnett's actions during plaintiff's informal hearing may have fundamentally undermined any meaningful presentation of her objections to HACC's denial of her application. Defendants claim that the conduct of the hearing satisfied the requirements of due process, but a hearing which fails in every way to afford an aggrieved party any meaningful review does not provide an opportunity to be heard and cannot satisfy the requirements of due process. *See, e.g., Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914) ("The fundamental requirement of due process of law is the opportunity to be heard."). Accepting the allegations in her Complaint as true in this motion to dismiss, I find that plaintiff has stated a claim that she was not afforded a "hearing" as contemplated by HUD regulation.

 Finally, the Court notes that Barnett may have evidenced a lack of impartiality to plaintiff's appeal of HACC's denial of her application in his post-hearing correspondence with plaintiff's counsel. In a September 25, 2002 letter to plaintiff's counsel Barnett wrote:

Lastly, while I cannot speak for the Hearing Officer, it was my observation in the 9/19 hearing that your tactics and the defense argument you presented on behalf of Ms. Baldwin as ill advised and not in your client's best interest. **In most cases involving denials due to credit, the Hearing Officers have tended to rule for overturning if the applicant can simply make a good argument or offer a valid reason or reasons for why their credit is the way it is. No such arguments were presented by yourself on behalf of Ms. Bald-**

**win, as you chose to argue for overturning based in some philosophical difference you have as to the actual policy of screening**. Your presence at the informal review on 9/19/02 was as Ms. Baldwin's attorney, not a public advocate. I would suggest you review your strategies in the future more carefully to make sure you are operating in your client's best interests.

Compl. at ¶ 33; Ex. 9 (emphasis added). Barnett's letter indicates that plaintiff needed only present a "good argument" to succeed in her appeal from HACC's denial of her application. Curiously, however, during that hearing, Barnett instructed Herrick not to receive plaintiff's evidence in support of her argument that she would be a suitable tenant, despite her creditworthiness. Barnett's actions thus may have frustrated the very showing he described in his letter and ostensibly made plaintiff's success at the review hearing impossible. Furthermore, to the extent the decision to deny plaintiff's application was based upon a disagreement with plaintiff's counsel's defense strategy rather than the merits of plaintiff's case, HACC's decision could be determined to be arbitrary and capricious. Thus, if plaintiff is able to prove her allegations, she may be able to show that defendants violated her due process rights.

### V. *Qualified Immunity*

Finally, the individual defendants assert that they are entitled to summary judgment on the basis of qualified immunity. They claim that plaintiff fails to allege any set of facts from which this Court could find the individual defendants liable in their personal capacities. Viewing the record in a light most favorable to the plaintiff, this Court finds that with regard to certain actions of defendant Barnett, genuine issues of material fact, sufficient to defeat a summary judgment motion, re-

main at this time. As to defendants Morales, Marquez, and Herrick, the Court determines that summary judgment on the basis of qualified immunity is warranted.

Qualified immunity will be granted in cases wherein officers have not violated any constitutional right of which a reasonable person would have known. *See Curley v. Klem,* 298 F.3d 271, 276 (3d Cir. 2002) (citing *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)); *see also Garlanger v. Verbeke,* 223 F.Supp.2d 596, 608 (D.N.J.2002). The Court of Appeals for the Third Circuit addressed the scope of an officer's reasonable conduct in *Curley v. Klem,* stating:

> If the alleged facts show that there was a constitutional violation, then the next step is to ask whether the right was clearly established. In other words, a court must consider whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. If a court concludes that an officer's conduct did violate a clearly established constitutional right, then it must deny him the protection afforded by qualified immunity.

298 F.3d at 277 (internal quotations and citations omitted). At this stage of litigation, a court "must accept all Plaintiff's allegations as true and draw all reasonable inferences in favor of the Plaintiff." *Garlanger,* 223 F.Supp.2d at 608.

At the outset, defendants assert that the test for qualified immunity focuses on whether the conduct of an officer violated a constitutional right. Def. Br. at p. 15. If not, they argue, qualified immunity should apply. *Id.* Plaintiff argues that an officer is not entitled to qualified immunity if the officer violates either a reasonably known constitutional right, or a reasonably known

*statutory* right. Pl. Br. at p. 35. Whether the qualified immunity test is exclusive to constitutional rights or inclusive of statutory rights is immaterial to the present matter, however, because plaintiff's Complaint includes an alleged violation of her procedural due process rights, secured under the Fourteenth Amendment of the Constitution of the United States. As discussed *supra,* there exists facts sufficient to support this claim.

With regard to defendants Morales and Marquez, plaintiff fails to allege any facts sufficient to trigger personally liability. Plaintiff asserts that the participation of Morales and Marquez in the July 2002 process of amending the HACC Administrative Plan provides a basis for personal liability. However, plaintiff does not present any evidence that they acted in a manner which might reasonably be determined a violation of plaintiff's constitutional rights. Neither Morales nor Marquez had any contact with plaintiff, nor does plaintiff present evidence that either took any action with plaintiff in mind. *See* Pl. Br. at p. 36. Without such evidence, individual liability cannot be demonstrated. Summary judgment in favor of defendants Morales and Marquez is therefore granted.

 Plaintiff alleges that defendant Herrick, who presided over her September 19, 2002 informal hearing, merely "rubberstamped" defendant Barnett's earlier rejection of her application. Plaintiff thus argues that Herrick violated her right to due process under the Fourteenth Amendment. However, plaintiff alleges no facts to support such a finding. She does not allege, for example, that Herrick failed to be impartial through her actions or words during the informal hearing. Nor does she allege that Herrick summarily affirmed denial of her application. Plaintiff asserts no more than that Herrick "served as the hearing officer" during plaintiff's

informal hearing. Compl. at ¶ 21. Plaintiff alleges no facts to support an inference that Herrick violated her constitutional rights during or after the September 19 hearing. Summary judgment in favor of Herrick is therefore granted.

■ Defendant Barnett is entitled to summary judgment with regard to his initial denial of plaintiff's application on August 7, 2002. As the Court has discussed *supra*, although creditworthiness was not properly adopted as a screening criterion when HACC rejected plaintiff's application for Section 8 vouchers, a reasonable officer in Barnett's position might have interpreted the complicated statutory and regulatory framework to allow HACC to add creditworthiness as it did in amendments to its Administrative and Annual Plans and deny plaintiff's application on that basis.

■ Barnett's possible liability arising out of the September 19, 2002 informal hearing is another matter, however. Barnett's presence and instruction to Herrick not to accept plaintiff's letter outlining her rental history may have prevented meaningful review of her grievance and denied her due process. Accepting the facts alleged in plaintiff's Complaint as true, I find that a question of fact exists as to whether a reasonable officer in Barnett's position would have recognized that his conduct violated plaintiff's clearly established constitutional right to due process. Accordingly, summary judgment in favor of Barnett is denied, as to his conduct during plaintiff's September 19, 2002 hearing.

## VI. *Plaintiff's Motion to Amend*

In her Brief in Opposition to Defendants' Motion to Dismiss, plaintiff seeks leave of the Court to file an Amended Complaint setting forth an alternative vehicle for relief, should the Court so require. *See* Pl. Br. at p. 34. Although plaintiff requests leave to amend only her claims alleging violations of the Housing Act, the Court determines that her entire complaint should be amended and each claim re-plead under 42 U.S.C. § 1983. It is undisputed that due process violations are enforceable under 42 U.S.C. § 1983. *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Doe v. Delie*, 257 F.3d 309 (3d Cir.2001). In addition, claims arising out of alleged violations of the Housing Act may also be brought pursuant to 42 U.S.C. § 1983. *Farley v. Philadelphia Housing Authority*, 102 F.3d 697 (3d Cir.1996). Relief for the claims brought by plaintiff in this case is more appropriately sought under this civil rights statute.

Rule 15(a) of the Federal Rules of Civil Procedure provides that "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served." Fed.R.Civ.P. 15(a). If a plaintiff seeks to amend [his or her] complaint after the defendant served [a] responsive pleading, the plaintiff "may amend [said complaint] only by leave of court." *Id.* Rule 15(a) clearly states that, "leave shall be freely given when justice so requires." *Id.* "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir.1997) (citations omitted); *see also Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir.1993). The Third Circuit has found that "prejudice to the non-moving party is the touchstone for denial of an amendment." *Lorenz*, 1 F.3d at 1414.

In this case, the Court finds that justice requires that plaintiff be granted leave to file an Amended Complaint restating her claims and identifying a proper vehicle for relief. Such an amendment will not prejudice defendants in this case. Under a

notice pleading system, it is enough that plaintiff's Complaint has apprized defendants of the facts out of which plaintiff's claims arise.[43] Therefore, plaintiff's request for leave to amend her Complaint is granted.

## CONCLUSION

For the foregoing reasons this Court finds that plaintiff's Complaint successfully states claims for which relief is available and therefore survives defendants' motion to dismiss. The Court grants summary judgment on the basis of qualified immunity in favor of defendants Morales, Marquez, and Herrick. Further, summary judgment in favor of defendant Barnett for those claims arising out of his conduct during plaintiff's September 19, 2002 informal hearing, is denied. In addition, plaintiff has failed to properly plead the appropriate statute by which she may seek redress of the alleged violations of her constitutional rights and of the Housing Act. The deficiencies in plaintiff's Complaint are technical but nonetheless require correction for this case to proceed. Plaintiff is ordered to file an Amended Complaint within thirty days, in accordance with this Opinion. An appropriate Order shall follow.

**43.** The Federal Rules of Civil Procedure provide that a complaint must include only a "short plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). Such a statement must merely "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In addition, Rule 8 instructs that "all pleadings shall be so construed as to do substantial justice." Fed.R.Civ.P. 8(f); *Conley,* 355 U.S. at 48, 78 S.Ct. 99. "The federal rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of the pleading is to facilitate a proper decision on the merits." *Conley,* 355 U.S. at 48, 78 S.Ct. 99.